16155

PEARCE-YOUNG-ANGEL CO., INC., v. CHARLES R. ALLEN, INC.

(50 S. E. (2d) 698)

*Messrs. Sinkler & Gibbs,* of Charleston, *for Appellant,*

*Messrs. Hagood, Rivers & Young,* of Charleston, *for Respondent,*

*Messrs. Sinkler & Gibbs,* of Charleston, *for Appellant,* in reply,

December 9, 1948.

BAKER, Chief Justice.

By its complaint, the respondent sought damages from the appellant because of an alleged breach of a sales contract, involving 800 bags of "Texas New Crop U. S. 1" blackeye peas, sold by the appellant to the respondent at $16.00 per 100 pounds, for delivery on or before June 30, 1947.

The answer of the appellant did not deny the existence of such contract, or the failure to deliver the peas, but pleaded that the peas, which were the subject of the contract, had been destroyed by an act of God, and by reason of the destruction of the subject-matter of the contract, the appellant was relieved from its obligation to make delivery.

By agreement, the matter was heard by Honorable J. Woodrow Lewis, Circuit Judge, without a jury. Judge Lewis handed down his order dated July 3, 1948, wherein he found as a fact (1) that the contract contemplated delivery of "Texas Nucrop U. S. one Black-eye peas" from any section of the State of Texas where they could be obtained for shipment on or before June 30, 1947, and, that the contract did not contemplate delivery of peas (grown) from any particular locality, section or farm in the State of Texas; (2) that delivery of peas of the quality contracted for from the State of Texas was not prevented by an act of God; and (3) that there were available peas of the quality and type contracted for by the parties, and such were available for shipment within the terms of the contract. He, therefore, ordered judgment for the respondent in the sum of $3,-200.00, with interest from the date respondent purchased peas to take the place of the peas, whose delivery was contracted for by the appellant.

Appellant states the "Questions Involved" to be: (1) Does the defense of destruction of the subject-matter of the contract by an act of God apply to the situation presented under the facts of this case? And (2) Does the evidence before the Court establish this defense?

Respondent states the "Questions Involved" to be: Is there any evidence to support the judge's findings of fact?

Appellant recognizes that in pleading the act of God as a defense, the burden of proof is on the pleader of such defense; and further, that if there is any testimony in the record from which a reasonable inference can

be drawn sustaining the findings of the trial Judge, applying the applicable law, then the judgment will have to be affirmed. It will therefore be necessary for us to set forth the facts, but as briefly as may be consistent with a discussion of the pertinent isssues raised by the appeal. It should be noted, however, that when upon the trial of the case, the appellant offered testimony tending to establish its defense that the performance of its contract was prevented and made impossible by the act of God, the respondent objected to such testimony, which objection was for the moment overruled, and that when the respondent later moved to strike out all such testimony, the trial Judge refused to do so then, stating that he would rule on its admissibility in his final order. It is obvious from a reading of the order of Judge Lewis that he did consider this testimony in the preparation of his order, and properly so, although he made no direct ruling on its admissibility one way or the other.

On or about June 13, 1947, Charles R. Allen, the active buyer and trader of the appellant, made a long distance telephone call from its Charleston Office to the Spartanburg Office of the respondent. He asked for and engaged in conversation with Mr. T. C. Young, who was at that time vice-president of and head buyer for the respondent. Mr. Allen told Mr. Young that he was offering a lot of Texas New Crop U. S. No. 1 blackeye peas to be shipped from the locality of Dilley, Texas. These peas were offered to Mr. Young as New Crop U. S. No. 1 Texas blackeyes. Mr. Young countered with the question, "Allen, how do you know they are going to be No. 1?" Mr. Allen explained to Mr. Young that the Dilley locality had been unusually dry until then, and for this reason the peas from this area that would otherwise have been sold as fresh peas for canning were drying and would be sold as dry blackeyes. Mr. Allen explained that he had bought the peas from a Mr. Willis (President of the Cherokee Canning Co.), of Cherokee County, Texas, and that he had acquired 7,000 bags of peas for delivery between

June 20 and June 30, his purchase being conditioned that he be furnished with: (1) U. S. grade certificates showing the peas to be No. 1's; (2) a certificate of fumigation to remove the possibility of trouble from weevils; and (3) a weight certificate. Mr. Young's answer to Mr. Allen on this day evinced interest in the offer but no contract was made at that time.

Further telephone conversations followed between Mr. Allen and Mr. Young regarding these peas, and on June 16, 1947, respondent wired appellant asking "Wire very lowest CX delivered car Texas Nu-Crop Usone Blackeyes giving exact date can make shipment." On the same day by telephone Mr. Young agreed to take a car of peas, and the oral contract thus made was confirmed by the following telegram sent by the respondent to the appellant on the same day: "We confirm Car Usone Nucrop Texas Blackeyes for shipment on or before June 30th bill car Columbia So-Car stopoff Asheville, NoCar and Spartanburg Confirm."

The following day, June 17, the appellant wired the respondent, "Confirmation Confirm 1,000 Bags Usone Texas Blackeyes shipment by June 30 16.00 delivered." Two days later, on June 19th, Mr. Young wrote the appellant stating that his understanding of the agreement was that it did not contemplate an order of 1,000 bags of peas, but rather an order of 800 bags. In this letter he also changed the car routing which he had previously given in his confirmatory telegram of June 16.

Mr. Allen left Charleston for Texas on the day the respondent sent the appellant the telegram confirming the telephone order for one car of peas. On the Saturday following the Monday on which the respondent confirmed its order for the car of peas, Mr. Allen arrived in Dilley, Texas, after spending two or three days in the Rio Grande Valley on other business. Here Mr. Allen found that two or three days prior to his arrival in Dilley there had been a torrential

rainfall of 5 to 6 inches, and that the pea fields were soaked in water and many of them standing in considerable water. (Mr. Allen's testimony concerning these excessive rains is corroborated by the Deposition of R. E. Cox, a farmer, who resides about four and one-half miles west of Dilley, in the County of Frio, Texas. In addition to farming, Mr. Cox operated a recleaning plant in the Town of Dilley, which cleaned peas, beans and sudan principally. He was familiar with the blackeyed pea crop in the Dilley, Frio County, area in 1947, and purchased peas for a pea dealer in San Antonio, Texas, during 1947. Mr. Allen's testimony is further corroborated by the Deposition of W. H. Wilson of Pittsburg, Texas, the General Manager of Gilbert G. Wilson Laboratories, engaged principally in the business of food industries, that is, handling both fresh and perishable products, canning, and the dry products. It grows and markets blackeyed peas, but procures a large volume of its dry peas from the Dilley section or territory of the State, which dry peas are usually available the latter part of June.)

These rains fell first at the time the pea crop was about to be harvested, and as a result of them the crop in the Dilley locality was ruined. When Mr. Allen found what had happened to the pea crop, he telephoned his Charleston office and gave instructions that all customers who had bought Texas Nucrop U. S. No. 1 blackeyes from him be notified of the situation. He then made exhaustive but unsuccessful efforts to secure U. S. No. 1 blackeyes from other sources.

On June 24 the appellant's Charleston office notified Mr. Young, of the respondent's Spartanburg office, with whom all negotiations concerning these peas had been conducted, about the terrific rains and the effect on the crops saying:

"The great amount of rainfall has affected the quality of the peas in the fields, and the Department of Agriculture Inspector is very doubtful whether any substantial quantity will grade U. S. One.

"In view of the fact that you desired prompt shipment, we thought that it is only fair that we advise you of these conditions and ask if you desire to hold your order as given, 800 bags, or shall we cancel same?"

The appellant received a reply to this from the respondent dated June 26. This letter was written by a Mr. L. T. Hamblin, who prior to this time, had had no connection with any of the dealings in this matter, all of which had been conducted by Mr. Young. Mr. Hamblin's letter states: "We do not wish to cancel this order, and we do expect delivery as confirmed."

On July 1, Mr. Young, the respondent's vice president and head buyer, who had conducted all the negotiations for the respondent prior to Mr. Hamblin's letter of June 26th, retired because of his age after 20 to 25 years service with the respondent. Mr. Hamblin took Mr. Young's place as buyer, but beginning with the letter of June 26, Mr. Hamblin took over from Mr. Young on this matter.

On July 1, despite the appellant's letter of June 24th, the respondent wired the appellant, "Advise Car Number and Routing Blackeyes Shipped Yesterday Rush Answer." In reply to this the appellant sent a lengthy telegram on the same day again explaining the crop situation resulting from the tremendous rains and stating that the weather conditions made it impossible to get shipments by June 30.

On the following day, July 2, the respondent bought from the Potts-Wilson Company at Fort Worth, Texas,, "800/ 100 No. Bags Recleaned and Fumigated New Crop Texas Blackeyes @ $20.00 Cwt." The respondent had begun negotiations with Potts-Wilson, Inc., for these peas as early as June 2, and long before respondent had made its contract with the appellant. Mr. Hamblin testified that these peas were bought by sample and not by U. S. Department of Agriculture grade certificate, which the peas contracted for with the appellant were required to have. The peas which

the respondent purchased from the Potts-Wilson Co. were not U. S. No. 1, although it is claimed by the respondent that such peas were comparable. Peas which do not grade U. S. No. 1 are sold by sample.

There is other testimony in the record, reference to which we will hereinafter make.

The destruction of the subject-matter of a contract by an act of God vitiates the contract, since where the existence of a specific thing is necessary for the performance of a contract, the accidental destruction or nonexistence of that thing excuses the promisor. Williston on Contracts, Vol. VI, sec. 1946, p. 5451.

"* * * It is a well settled rule of law, that if a party by his contract charges himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. * * *" *Dermott, Executor, v. Jones,* 69 U. S. 1, 2 Wall. 1, 17 L. Ed. 762.

As stated in appellant's printed brief, surprisingly enough in a state which for so long a time has been predominantly agricultural, there are no South Carolina cases on the precise issue here involved.

In the order of Judge Lewis, he correctly states the general governing law as decided by the courts of other states, and which we consider sound so far as it goes. The appeal here does not question this principle of law (on the other hand it pleads such principle), but does question the result of its attempted application to the facts of the instant case. We quote from the order of Judge Lewis:

"The rules of law applicable here are stated in the Annotation in 12 A. L. R. at page 1288, as follows:

"Whether or not a contract for the sale of produce to be delivered at a certain future date contemplates that it shall

be grown on a particular tract of land, so that a failure of the crop on that land will excuse non-delivery is often a close question of construction of the particular contract. The rule appears to be that if the parties contemplate a sale of the crop, or of a certain part of the crop, of a particular tract of land, and by reason of a drought or other fortuitous event, without fault of the promisor, the crop of that land fails or is destroyed, non-performance is to that extent excused; the contract, in the absence of an express provision controlling the matter being considered as subject to an implied condition in this regard; but that, if the contract does not specify or contemplate the crop of any particular tract of land, non-performance will not be excused merely because it happens that, on account of a drought or other fortuitous event, without his fault, the promisor is unable to perform the contract, the cases following in this respect the general rule that the mere inability of the obligor to perform will not ordinarily excuse non-performance."

"See also Annotation in 74 A. L. R., 1287; also 12 Am. Jur., 948, Contracts Sec. 374; 17 C. J. S., Contracts, § 463, page 952 *et seq.*"

In the same Annotation in 12 A. L. R., pp. 1276-1277, and quoting from *St. Joseph Hay & Feed Co.,* *v. Brewster,* Mo. App., 195 S. W. 71, we find: "The general rule is that, when one by his contract assumes an obligation, he is bound thereby, and must make his agreement good even though accidents, or forces over which he has no control and for which he is in no way to blame, intervene and destroy the means by which he was expecting to be able to perform; because he might have provided in his contract against such contingencies. * * * There is an exception to this old and well-established rule, however, and that is that where the contract is with reference to particular property, *or to something derived, from a particular source,* and the same is destroyed by what is commonly called an act of God, then the destruction of such property excuses

performance. Stated, perhaps, in a somewhat more nearly accurate form, the contracting party is absolved from his obligation, not because the destruction or unforeseen and unavoidable contingency excuses him, but because the contract was not in reality an absolute contract, binding him to performance under all circumstances, but only to perform under certain circumstances and conditions; as, for instance, to sell and deliver a specific crop off of particular land. If the particular subject of such a contract goes out of existence through no fault of the contracting party, the contract is incapable of being performed on either side. In such case, the parties can be said to have contracted on the condition that the subject thereof should be in existence at the time of performance." (Emphasis added.)

The above annotations followed the report of the opinion of the Nebraska Supreme Court in *Matousek v. Galligan,* 104 Neb. 731, 178 N. W. 510, 12 A. L. R. 1270, which case is here mentioned mainly as authority for the admission of the testimony in the instant case which was objected to when offered, but admitted and considered by the Circuit Judge. However, there is no issue now raised concerning the admission of this testimony.

In the *Matousek case,* the only written evidence of the contract was as follows:

"April 5, 1917. This is an acknowledgment of $150.00 payment on about 60 tons of hay at $9.25 per ton delivered in barn or cars at Atkinson, Neb., good No. 1 merchantable hay to be delivered on or before May 10, said hay sold to Joseph Matousek.

"J. F. Galligan.<br>
"Joseph Matousek."

The testimony was conflicting as to whether the merchantable hay there contracted for was specific hay grown on land of the seller (defendant). The Court permitted evidence to show just what hay was in the minds of the contracting par-

ties—what hay was the subject-matter of the contract. The defense in that case was that the performance of the contract was prevented by storms and unusual rains which constituted an act of God. The Court said: "Also on the question whether defendant and plaintiff contracted for this hay with reference to specific hay situated on the land of defendant there is a conflict in the evidence, but the jury found in favor of defendant."

The case of *Robinson Co. v. McClaine,* 98 Wash. 322, 167 P. 912, is apposite to the one under discussion, and like the *Matousek case,* was an action to recover damages claimed upon the alleged breach of a contract to deliver hay. The contract of sale was evidenced by correspondence between the seller and the purchaser. Performance on the part of the seller was made impossible by unprecedented snowfall in locality of the source of the seller's supply. The court there held that a recovery could not be had. The syllabus, which is fully warranted by the opinion, reads as follows: "A sale of hay by correspondence was an executory contract for the sale of specific property, and not an undertaking to deliver a specific quantity, so that the seller would not be liable for failure to deliver where it was totally destroyed without his fault, where it appears that the amount sold was seven hundred tons at $18.50 per ton, that the subject-matter of the contract was hay grown in a certain valley owned by the seller and then in stack and was to be baled pursuant to particular instructions, and that the hay had been described to the buyer."

Attention is also called to the case of *Snipes Mountain Co. v. Benz Brothers & Co.,* 162 Wash. 334, 298 P. 714, 74 A. L. R. 1287.

The record convincingly shows that Mr. Young, the vice president of and head buyer of the respondent at the time the contract was entered into, and the only person connected with the respondent who had any personal knowledge of the ne-

gotiations, was fully aware of the fact that the peas which the respondent was buying from the appellant were to come from the locality of Dilley, Texas. It further shows that both the representatives of the appellant and of the respondent were familiar with the difficulties generally attendant to peas from this locality. The respondent did not agree to purchase until it was satisfied that the appellant was reasonably sure of its source of supply.

It is worthy of note that although the respondent ▪ was aware of the defense of the appellant, Mr. Young was not called as a witness by the respondent, either by deposition or upon the trial of the case, to refute the testimony of Mr. Allen, who had entered into the contract on behalf of the appellant, to the effect that the respondent knew the contemplated source of the appellant's supply of peas with which to fulfill its contract. The failure of the respondent to produce as a witness, Mr. Young, and its failure to explain his absence as a witness, gives rise to the inference that Mr. Young's testimony would have been unfavorable to the respondent, and would have corroborated Mr. Allen's testimony. *Robinson v. Duke Power Co..* 213 S. C. 185, 189, 48 S. E. (2d) 808, and cases therein cited.

There was likewise no attempt to contradict the testimony on behalf of the appellant as to the torrential rains throughout the Dilley, Texas, area, and resulting in destroying the appellant's source from which to obtain peas of the quality which it had agreed to deliver.

In discussing, and in considering the facts of this ▪ case, we are not unaware of the rule in this State that this Court has no power in a case at law to reverse the findings of the Circuit Judge unless they are wholly unsupported by evidence or are manifestly influenced or controlled by error of law. However, the Supreme Court does not only have the right, but it is its duty to review the record and determine if there are any facts supporting the findings of the lower Court.

It appears to us that the finding by the Circuit Judge "that the contract did not contemplate delivery of peas from any particular locality, section * * * in the State of Texas" is wholly unsupported by the evidence. The appellant has conclusively shown by uncontradicted testimony that Mr. Young, the vice president and buyer of the respondent, and the one who handled all of the negotiations looking to the purchase of these peas, knew that the appellant expected to obtain these peas from the section or locality of Dilley, Texas. Not only did Mr. Young know this, but he knew that the subject-matter of the contract was to come from a specific crop then about to be harvested in the particular locality of Dilley, Texas. And there is no contradiction of this fact, circumstantial or direct.

The appellant has shown by uncontradicted testimony that U. S. No. 1 blackeye peas were not procurable in the latter part of June, 1947, in the Dilley section of Texas because of the fact that the June blackeye pea crop of that section of Texas was destroyed by unexpected and torrential rains.

The trial Judge "further found as a fact that delivery of peas of the quality contracted for from the State of Texas was not prevented by any Act of God" and "that such were available for shipment within the terms of the contract."

The testimony on behalf of the appellant is that U. S. No. 1 peas (the grade and quality of peas contracted for) were not available anywhere in the State of Texas on or about June 30, 1947; that it made every effort to procure such quality peas and was unable to do so for the reason that there were none. The respondent attempts to refute this by testimony of its buyer who succeeded Mr. Young, a Mr. Hamblin, that peas which it bought from Potts-Wilson by sample, not by grade certificate, were in his opinion (although the witness admitted that he had never graded peas), the equivalent of U. S. No. 1. The fact remains, however, that these peas which were obtained by the respondent, in

addition to having been sold by sample, were not graded U. S. No. 1 by either Potts-Wilson or by the respondent, and the uncontradicted testimony is that only peas inferior to U. S. No. 1 are sold by sample.

We can conjecture what position the respondent would have taken in reference to the fulfillment of its contract by the appellant if the peas maturing the latter part of June, 1947, in the locality of Dilley, Texas, had not been made unvailable by the torrential rains, and the appellant had undertaken to deliver the grade and quality of peas which the respondent procured from Potts-Wilson, as and for a discharge of its contractual obligation.

The fact that the respondent was able to purchase only peas sold by sample, and then at a price considerably above the price at which peas of the quality contracted for with the appellant would have sold, except for the torrential rains in the locality of Dilley, Texas, is corroborative of the testimony of the appellant that the entire crop of U. S. No. 1 Blackeye peas from the Dilley section of Texas, the only section in the State of Texas where peas of the quality contracted for were ever available on or about June 30, had been destroyed. In fact, the record is devoid of any testimony that peas of the quality called for by the contract were obtainable from any portion of the State of Texas for delivery on or about June 30, 1947.

Under the evidence disclosed by the record in this case we can reach no other conclusion than that the contract entered into between the appellant and the respondent had reference to peas from the Dilley locality of the State of Texas, and such was in the contemplation of both parties to the contract when entered into; and that the subject-matter thereof was destroyed by an act of God which prevented the performance of the contract by the appellant.

Reversed and remanded with instructions to enter judgment in behalf of the appellant under Rule 27 of this Court.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.