The B's COMPANY, INC., Defendant and Third-Party Plaintiff, Appellant,

v.

B. P. BARBER & ASSOCIATES, INC., Third-Party Defendant, Appellee.

No. 11357.

United States Court of Appeals Fourth Circuit.

Argued Nov. 10, 1967.

Decided Feb. 2, 1968.

D. A. Brockinton, Jr., Charleston, S. C. (Brockinton & Brockinton, Charleston, S. C., on brief), for appellant.

Kirkman Finlay, Jr., Columbia, S. C. (W. C. Boyd, and Boyd, Bruton, Knowlton & Tate, Columbia, S. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, CRAVEN, Circuit Judge, and WOODROW WILSON JONES, District Judge.

WOODROW WILSON JONES, District Judge:

This action was instituted in the United States District Court for the District of South Carolina, Charleston Division, by W. J. McLamb, trading as W. J. McLamb & Son Construction Company, a North Carolina citizen, hereinafter referred to as "McLamb", as a declaratory

judgment action against Ruscon Construction Company of Florida, a Florida corporation, hereinafter referred to as "Ruscon", and the appellant, The B's Company, a South Carolina corporation, hereinafter referred to as "The B's Co."

Ruscon entered into a contract with the Beaufort County Water Authority to install two 24-inch water mains under the Broad and Chechessee Rivers, Beaufort County, South Carolina. Ruscon then entered into a subcontract with McLamb, whereby Ruscon would provide the material and McLamb would perform the installation, which subcontract McLamb assigned to The B's Co., the appellant. The plans and specifications for the mains were prepared for the Beaufort County Water Authority by B. P. Barber & Associates, Inc., hereinafter referred to as "Barber", the appellee. After three attempts The B's Co. did not succeed in the installation of the mains and Latex Construction Company, hereinafter referred to as "Latex", subsequently installed them for Ruscon.

McLamb asks the court to determine the rights and obligations of the parties under the subcontract and assignment. Ruscon counterclaimed against McLamb and impleaded McLamb's bonding company for failure to perform the subcontract. The B's Co. counterclaimed against McLamb and cross-claimed against Ruscon alleging that the plans, specifications, and the Armco steel pipe furnished for the job by Ruscon were faulty, inadequate, insufficient, erroneous and unfit for their intended purpose. The B's Co. impleaded Armco Steel Corporation, hereinafter referred to as "Armco", third party defendant alleging in its third party complaint that the steel pipe manufactured by Armco and furnished by Ruscon was faulty. The B's Co., appellant, also named Barber. the appellee, as a third party defendant and alleged in its third party complaint and undertook to prove at the trial before the Judge without a jury, that the plans and specifications prepared by Barber were impossible to perform. This is the issue which was ruled on by the District Judge on the mo-

tion by Barber for an involuntary dismissal of the third party complaint at the conclusion of the case of The B's Co. This appeal is from the order of the District Court pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S.C. A., granting the appellee's motion for an involuntary dismissal because of the failure of The B's Co. appellant, to offer credible evidence to prove impossibility of performance of the contract according to the plans and specifications. The trial judge in his order of dismissal made extensive and detailed findings of fact in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C. A.

The basic question raised here is whether or not the District Judge committed error in granting the motion of Barber, the third party defendant at the conclusion of the case of The B's Co. for the involuntary dismissal of the third party complaint under Rule 41(b).

█ Rule 52(a) requires the District Judge in an action tried without a jury to find the facts specially and state separately his conclusions of law thereon, and provides that these findings of fact shall not be set aside by the reviewing court unless clearly erroneous; and further provides that due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. This provision applies to the motion made in this case under Rule 41(b). See Rule 52(a). Palmentere v. Campbell, 344 F.2d 234 (8th Cir. 1965); O'Brien v. Westinghouse Electric Corporation, 293 F.2d 1 (3rd Cir. 1961).

█ "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746. Even if this court disagrees with the conclusions reached by the trial judge, this alone is not enough to set the findings aside. Judge Sobeloff said in the case

of Jersey Insurance Company of N. Y. v. Heffron, 242 F.2d 136 (4th Cir. 1957):

" * * * While the Court of Appeals has broader powers in reviewing a District Judge's findings of fact than in reviewing the findings of a jury * * * it will not disturb his findings merely because it may doubt their correctness. It is required that the Court of Appeals be satisfied that the District Judge is clearly in error before it will set his findings aside * * * "

The appellant, The B's Co. alleged negligence on the part of Barber in the engineering of the job and in the preparation of the plans and specifications. It further contends that Barber warranted the fitness of the plans, specifications, pipe and materials for their intended purpose by furnishing them, and by requiring The B's Co. to rely thereon and adhere thereto. It further contends that the job could not be performed in accordance with the plans and specifications and by using the materials provided and that Barber wrongfully refused to change the plans and specifications when requested to do so by The B's Co. but did approve changes to enable Latex to perform and complete the job. It is argued by appellant that its evidence established these allegations and therefore made out a prima facie case for relief on the third party complaint without the necessity or benefit of drawing the most favorable inferences and that the court should have, at least, required the appellee to go forward with its evidence before granting an involuntary dismissal under Rule 41(b).

The record in this case is voluminous consisting of hundreds of pages of testimony, numerous depositions, exhibits and other documents and a somewhat detailed recital of the testimony is unavoidable.

The project involved in this controversy consisted of the furnishing and constructing of two subaqueous water transmission mains, 24 inches in diameter, under the Broad and Chechessee Rivers, two tidal streams in Beaufort County, South Carolina. The plans and specifications provided for cement lined pipe, but allowed the contractor to select one of three types of pipe: cast iron pipe, steel water pipe with electrically welded spiral or straight seam, or prestressed concrete cylinder pipe. Ruscon's bid, prepared by The B's Co., was based on Armco spiral weld steel pipe because it was considerably less expensive than the other types and Armco gave them a favorable quotation. After the contract was let Armco furnished shop drawings for said pipe in accordance with the plans and specifications. These shop drawings contained miter joints and these were approved by Barber. Armco made the pipe to order in 40-foot sections and lined them with cement mortar flush with the bevel ends of the pipe in accordance with the plans.

The B's Co. proposed the use of the lay barge method of installing the pipe which Barber approved, and began the job of laying the pipe across and under the 7,000 foot Broad River. The lay barge plan consisted of welding two 40-foot lengths of Armco cement lined spiral steel pipe together forming an 80-foot cylinder (termed "double-jointing,") and then welding these 80-foot length cylinders together and laying them successively into the river off of and behind a lay barge, thereby gradually extending the pipe line across and under the tidal river. The B's Co. strapped two of these pipe lines together and proceeded to lower them simultaneously from the barge into a trench on the bottom of the river. When the work progressed about 1200 feet from the shore line and while injecting ballast water into them for submergence, the pipe failed in a welded joint and sank. The pipe was recovered and another effort was made and after about 3000 feet was laid, the pipe failed in a joint and sank again. After the same thing occurred upon the third trial, Ruscon defaulted McLamb and awarded the subcontract to Latex.

The record shows that Latex installed the pipe successfully using an entirely different method than the one attempted

by The B's Co. First it dredged a trench across the river deep enough to place the pipe in a reasonably smooth profile and have a minimum of three feet to refill on top of the pipe. This in turn eliminated the necessity of miter joints and the sections of pipe were welded together on the bank of the river into one long cylinder. The pipe was then given an outer coat of concrete for the protection of the pipe and to give it negative buoyancy, thereby eliminating the necessity of using ballast water. The pipe was then pulled across the river into place by a cable attached to a machine on the opposite bank of the river. The job was concluded and the record indicates the water transmission pipe lines are now performing the function for which they were designed.

■ The B's Co. contends the plans and specifications as prepared and provided by Barber were impossible of performance in several major instances and to prove this it relied upon the alleged changes Barber made to enable Latex to perform the contract. It contends that the plans and specifications required the use of miter joints and that pipe with miter joints could be installed only by the use of the lay barge method, and that the force of the tide and current in the river made this impossible. The purpose of the miter joints was to allow the pipe to make up and down angular deflections to prevent over stressing. Since Latex dredged a trench to a reasonably smooth profile thereby not requiring bends in the pipe, it was unnecessary to use miter joints. The trench as dredged by Latex was of such a curvature as would not overstress the pipes without the use of miter joints. After hearing the evidence and examining the contract the court found that it was not necessary that miter joints be used to meet the plans and specifications furnished by Barber. It further found that The B's Co. had the right under the contract to select the method to be used in laying the pipe and that it selected and attempted to use the lay barge method for the reason that this was the type of equipment it had avail-

able. Upon a careful examination of the record, we conclude that the trial judge's findings in this respect were not clearly erroneous.

The appellant contends the plans and specifications required the use of fiber board as an outer coat for the pipe and that a change was made so that Latex could use concrete in order to complete the job. There was testimony that the concrete overcoat put on the pipe by Latex provided more protection to the pipe than the fiber board. An expert witness for the appellant testified that fiber board was a standard product within the meaning of the Standard Product's Section of the specifications and that under this specification a concrete outer coating could be used in place of fiber board with the permission of the engineer which Latex received and that it would protect the pipe. The District Judge held that the specifications allowed the use of a concrete coating to cover the pipe. We agree with his holding.

The B's Company also contends that the plans and specifications (Section 36–12) require the use of water ballast and that this requirement played a big part in making performance impossible. It relies upon the following sentence of the Section: "In case the weight of the pipe in its coating is not sufficient to provide negative buoyancy, the pipe shall be submerged cautiously by slowly filling the line with water." This interpretation overlooks another sentence in the same section which provides: "The contractor may elect and use any other procedure for the installation of the crossing, subject to the approval of the engineer." The concrete overcoat was permitted to provide a protective coating to the pipe and at the same time gained negative buoyance so that fresh water was not needed for ballast. The District Judge held that under any reasonable interpretation of the contract and specifications this was permitted and that the appellant was not justified in placing its narrow interpretation on this section. In this we agree.

The B's Co. next attacks the method of welding the pipe and stresses this point as perhaps the greatest reason why the plans and specifications were impossible of performance. It contends the plans and specifications required the steel pipe to be butt welded with the interior cement mortar lining flush with the beveled ends of the pipe. The specifications provide that the interior surface of the steel pipe was to be cement mortar lined, and that the end of the 40-foot lengths of pipe were to be separated by a spacing of ⅛ of an inch when the ends were butt welded and that after the welds were made the interior of the pipe at this ⅛ of an inch spacing was to be brushed clean and packed with a stiff cement mortar mix, the purpose of this being to provide a continuous concrete inner lining in the pipe.

The appellant contends it orally requested permission to cut back the interior cement mortar lining, which was denied by Barber, and that welding with the concrete flush with the beveled ends precluded satisfactory butt welds and thereby caused the failures in the three installation attempts. It contends the concrete would boil up into the weld as it was made thereby preventing a good weld. It further contends that Latex was subsequently allowed to cut back the inner lining in order to successfully weld the butt joints.

The record shows that Latex in making its welds to join the 40-foot sections of pipe first cut back the concrete inner lining about ¼ of an inch from the beveled ends of the pipe. After the weld was made a man was sent into the 24-inch pipe from the shore end to regrout or place cement mortar in the ⅟₁₆ of an inch space (¼ of an inch on the end of each pipe plus the separation of ⅛ of an inch maintained between the sections of pipe when welded as provided by the specifications). Before beginning this procedure, Latex outlined it to Ruscon and Barber as part of its overall plan to lay the pipe and there were no objections made to this method by Barber. An official of Latex testified that he was not sure that it was necessary to cut back the lining but thought it best and that permission to cut it back was conditioned upon a satisfactory regrouting of the ⅛ of an inch space. All parties agree that the specifications required the space between the pipe sections after welding be regrouted so as to have a continuous concrete lining the length of the main.

Appellant contends it was impossible to obtain a weld of the required strength with the cement inner lining flush with the beveled ends of the pipe. The expert evidence showed the minimum tensile strength of mill type steel water pipe grade B as specified in the plans and specifications to be 60,000 pounds per square inch. The specifications required that the tensile strength of the butt weld should not be less than 85 per cent of the minimum of the specified tensile strength of the base material used. The court therefore correctly found that the specifications required the butt weld to be of the minimum tensile strength of 51,000 pounds per square inch. One expert witness called by appellant testified that he made one field weld on the job which tested to 55,147 psi. The balance of his tests were made from small sections of the pipe some of which were welded with the cement lining cut back and some with the cement lining flush with the beveled ends. The sections with the lining cut back tested at 72,945 and 72,756 psi and the sections with the lining flush tested at 60,000 plus and 61,895 psi. Another expert witness called by appellant testified that his tests of sections welded with lining flush showed tensile strength of 61,200 and 60,250 psi. The District Judge properly held that this testimony proved that it was possible to make welds with the cement lining flush with the end of the pipe which exceeded the minimum of 51,000 psi required of the welds by the specifications.

There was evidence presented that The B's Co. was having trouble with its welds but there appears to be no specific testimony as to exactly what type weld it was getting in every instance. Boykin, President of The B's Co. admitted

in a deposition that he was not completely satisfied with two of his welders and that their welds were used in the first two installation attempts. One bad weld could cause the pipe to break. Thus the evidence presented by appellant seems to prove only that some welds held and some did not.

There was no substantial evidence offered by the appellant which showed, with any degree of certainty, the stress to which the pipe was subjected in each of the three installation attempts. The trial judge found that the pipe was subjected to unknown stresses during the three attempted installations. In the first attempt an unknown stress resulted from the water shifting places within an air pocket which had been created by appellant's failure to provide an air relief valve. In the second attempt two lines of pipe were installed behind the barge and they remained on the surface of the river from April 21 to May 1, 1964, and were subjected to stresses from the wave action and tides which were undefined in the testimony. In the third attempt one of the pontoons got away which varied the stresses on the pipe from current and tide which again was undefined by the evidence.

It was admitted by the appellant that on the three attempts to install the pipe it broke twice in a spiral weld which was a weld placed in the pipe by the manufacturer, Armco, and once in a butt weld. The fact that the pipe broke in a spiral weld demonstrates that it was subjected to stresses in these installation attempts by The B's Co. which exceeded the strength of the pipe, which met the requirements of the specifications.

There was no evidence as to the stress placed upon the pipe when it was installed by Latex. The Latex method with an experienced crew and proper equipment worked perfectly. This method was available to the appellant. The contract placed the responsibility for the proper installation of the pipe on the contractor to complete the job within the specifications as furnished by Barber.

This Latex did, thus proving the possibility of performance.

█ The contention that the Judge committed error when he failed to find from the evidence that appellee wrongfully refused to change the plans and specifications when requested to do so by The B's Co. but did approve such changes to enable Latex to perform and complete the job, requires detailed consideration.

One change made by Latex and approved by Barber was the method of laying the pipe and the elimination of miter joints. The record is clear that The B's Co. proposed the use of the lay barge method of laying the pipe and obtained Barber's approval of its plan. We have already discussed the plan proposed and used by Latex which did not require the use of miter joints. The evidence shows that before the shop drawings were prepared by Armco, Boykin, President and general manager of The B's Co., drew a red line on the profile contained on the drawings of the Broad River and requested Barber's permission to install the pipe to this red line rather than to the profile shown on the drawings. This request was made by Boykin after he had spent considerable time making soundings of the river and selected the new profile for the pipe. Barber gave its permission and the plans then went to Armco who prepared shop drawings and manufactured the pipe to fit the requirements. The shop drawings would show the miters, if they were required in the opinion of Armco for the pipe to be installed to the red line drawn by Boykin. It appears that the purpose of the shop drawings is that once they are approved, there is no question as to the pipe not being manufactured properly for the job. The pipe was then manufactured in such a way that it could be installed to meet the profile selected by The B's Co. and indicated on the plans by the red line drawn by Boykin. At the trial Boykin testified he requested the elimination of all miters which request was denied by Barber. Harold Wrenn, President of Barber, testified that Boykin made no request to eliminate all

miters, but did say that his selection of a new profile for the pipe would require a fewer number of miter joints. He further testified that no other mention was made of miter joints.

The other changes complained of by The B's Co. consist of the use of a concrete outer lining on the pipe and the elimination of water ballast for submergence, and the cutting back of the interior cement mortar lining of the pipe to prevent interference with the proper butt welding of the joints.

There is no evidence in the record to the effect that The B's Co. requested permission to use a concrete outer lining or to eliminate the use of water as a ballast to sink the pipe. It nevertheless contends that the use of concrete as an outer-coating for the protection of the pipe and for negative buoyancy was a change in the specifications, and had it been allowed to make this and other changes, the contract could have been performed. The appellant's expert witness, Dan C. Tindal, an engineer, admitted that fiber board was a standard product under the Standard Product's Section of the specifications and that concrete outer-coating was also a standard product which could be substituted. We have already discussed the provision of the contract relating to the use of water as a ballast. It was to be used solely for negative buoyancy and when the concrete outer-coating was used there would be no need for water ballast.

The court properly found from the expert evidence that the welds could be made in accordance with the plans and specifications without the inner lining being cut back from the beveled ends of the pipe. Latex decided to cut it back ¼ of an inch from the end of each pipe before welding as a precautionary matter. The B's Co. contends it repeatedly complained to Barber about the butt welds and asked permission to cut back the concrete liner from the beveled end of the pipe to enable it to obtain complete penetration on the welds, and that these requests were refused. No witness other than Boykin testified as to these requests and Barber denies any such requests were ever made. On these issues the Judge was confronted with conflicting testimony and it then became his duty to pass upon the credibility of the witnesses. As the reviewing court, we are required under Rule 52(a) to give due regard to his opportunity to judge of the credibility of the witnesses. He has resolved this question against the appellant and in this we cannot say he was clearly erroneous.

The evidence shows this to be a most difficult job requiring an experienced crew and proper equipment, but the trial judge found that it was not impossible to perform. It appeared most difficult or perhaps impossible for The B's Co. but apparently a routine operation for an experienced operator in the field, Latex. There was ample evidence in the record to justify this finding by the court.

Impossibility of performance of a contract may be classified as objective impossibility (the thing cannot be done) or as subjective impossibility (I cannot do it). It is generally well settled that subjective impossibility, that is, impossibility which is personal to the promisor and does not inhere in the nature of the act to be performed, does not excuse nonperformance of a contractual obligation. 17 Am.Jur.2d, Section 415, Contracts. 17A C.J.S. Contracts § 459. In the case of Pearce-Young-Angel Company v. Charles R. Allen, Inc., 213 S.C. 578, 50 S.E.2d 698 (1948), the court stated that it is a well settled rule of law "that if a party by his contract charges himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party." The trial judge found that the evidence proved that there was difficulty, expense and possible hardship involved in the performance of the contract by The B's Co., but that this did not render the performance impossible and that the difficulty of performance did not relieve it from its obligation to perform in accordance with its promise. There was

ample evidence upon which to base this conclusion.

 The appellant strongly contends that the testimony of Mr. Boykin, together with its other evidence, established a prima facie basis for relief on the third party complaint and it was error to grant Barber's motion to dismiss. It cites several cases from other circuits to support this contention, all of which are distinguishable from the case at bar. The appellant relied on Benton v. Blair, 228 F.2d 55 (5th Cir. 1955) but in that case the court in overruling the trial judge said it was clearly error for the district judge to reject the uncontradicted, unimpeached and not inherently improbable or suspicious testimony of plaintiff. In the case at bar the court found that Boykin, who was President and half owner of The B's Co., was an interested party and that much of his testimony was self-serving; that the evidence was conflicting and that on cross examination the expert evidence offered by appellant, while raising questions as to the soundness of the design, tended to prove that a competent contractor could have met the requirements of the specifications. The Judge as the trier of the facts was not bound to view the evidence in the light most favorable to the appellant with the attendant favorable inferences and presumptions but was bound to take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as he believed it entitled to receive. Allred v. Sasser, 170 F.2d 233 (7th Cir. 1948); Palmentere v. Campbell, supra.

 There was substantial evidence in the record upon which the trial judge based his findings and conclusions and we cannot disturb them unless upon review of the entire evidence, we are left with the definite and firm conviction that a mistake has been made. After a careful examination of this lengthy record, we cannot conclude that any mistake was made and certainly we cannot find that these findings and conclusions were clearly erroneous. Under these circumstances, it is therefore unnecessary to consider whether or not there was privity of contract between The B's Co. and Barber, and the judgment of the District Court will be

Affirmed.