660 F.2d 450
 James W. MILLER, d/b/a Miller Construction Company, United
States Fidelity and Guaranty Company, a Maryland
Corporation, Defendants-Appellees,
v.
The CITY OF BROKEN ARROW, OKLAHOMA, Defendant and Third
Party Plaintiff-Appellant,
v.
BENHAM BLAIR & AFFILIATES, INC., a Delaware Corporation
d/b/a W. R. Holway and Associates, Third Party
Defendant-Appellee.
James W. MILLER, d/b/a Miller Construction Company, United
States Fidelity and Guaranty Company, a Maryland
Corporation, Defendants-Appellees,
v.
BENHAM BLAIR & AFFILIATES, INC., a Delaware Corporation,
d/b/a W. R. Holway and Associates, Third Party
Defendant-Appellant,
v.
The CITY OF BROKEN ARROW, OKLAHOMA, Defendant and Third
Party Plaintiff-Appellee.
 Nos. 80-1247, 80-1261.
 United States Court of Appeals,
Tenth Circuit.
 Argued July 13, 1981.
Decided Sept. 22, 1981.
Rehearing Denied Oct. 27, 1981.
 
 Dennis D. King, Tulsa, Okl. (Ray H. Wilburn, Tulsa, Okl., with him on the brief), of Ray H. Wilburn & Associates, Tulsa, Okl., for City of Broken Arrow, Okl.
 Harry M. Crowe, Jr., of Crawford, Crowe & Bainbridge, Tulsa, Okl. (Donald G. Hopkins of Hopkins, Warner & King, Tulsa, Okl., with him on the brief), for Benham Blair & Affiliates, Inc.
 David H. Sanders, Tulsa, Okl. (Philip J. McGowan, Tulsa, Okl., with him on the brief), (Sanders, McElroy & Carpenter, Tulsa, Okl., of counsel), for James W. Miller.
 Before BARRETT and LOGAN, Circuit Judges, and CHILSON, Senior District Judge.*
 BARRETT, Circuit Judge.
 
 
 1
 These consolidated appeals involve a contract dispute relative to the installation of a sewer line.[1]
 
 
 2
 Miller Construction Company (Miller), a utility contractor, contracted with the City of Broken Arrow, Oklahoma (City) for the installation of the line in accordance with the plans and specifications of Benham-Blair & Affiliates, Inc. (Engineers), the engineering firm retained by City to serve as its representative in the planning, designing, and inspection of the construction of City's sewer line project.
 
 
 3
 Article II of Miller's contract with City provided:
 
 
 4
 Article II. CONTRACTOR'S OBLIGATION The work to be done under this contract is specifically set forth in the specifications attached hereto.
 
 
 5
 The Contractor shall and will, in good and workmanlike manner, do and perform all work and furnish all supplies and materials, machinery, equipment, facilities and means, except as herein otherwise expressly specified, necessary or proper to perform and complete all the work required by this contract within the time herein specified, in accordance with the provisions of this contract and said specifications and in accordance with the plans and drawings of the work covered by this contract, and any and all supplemental plans and drawings, and in accordance with the directions of the Engineers as given from time to time during the progress of the work. The Contractor shall observe, comply with, and be subject to all terms, conditions, requirements, and limitations of the contract, and shall do, carry on, and complete the entire work to the satisfaction of the Engineers and of the City.
 
 
 6
 (R., Pl. Ex. 62). (Emphasis supplied).
 
 
 7
 Article III of Miller's contract with City provided:
 
 
 8
 Article III. ENGINEERS' POWERS AND DUTIES The Engineers shall give all orders and directions contemplated under this contract and specifications, relative to the execution of the work. The Engineers shall determine the amount, quality, acceptability, and fitness of the several kinds of work and materials which are to be paid for under this contract and shall decide all questions relative to said work and the construction thereof. The Engineers' estimates and decisions shall be final and conclusive, except as herein otherwise expressly provided. In case any question shall arise between the parties hereto relative to said contract or specifications, the determination or decision of the Engineers shall be a condition precedent to the right of the Contractor to receive any money under this contract for anything affected in any manner or to any extent by such question.
 
 
 9
 (R., Pl. Ex. 62). (Emphasis supplied).
 
 
 10
 City's contract with Engineers provided, inter alia:
 
 
 11
 NOW THEREFORE, the Engineers agree to perform the engineering services herein described with respect to the investigation, design, and construction of the Project in accordance with the provisions herein set forth. The City agrees to pay the Engineers for such services at the time, in the manner, and according to the schedules herein set forth.
 
 
 12
 Section 1. Scope of Services. The services to be performed under this Agreement consist of the investigation and design of the Project and inspection of the construction thereof.
 
 
 13
 a. Preliminary and General Services. The Engineers agree to furnish services as follows:
 
 
 14
 4. The Engineers shall provide at its own expense a suitable engineering staff to plan, design, prepare the plans and specifications, and inspect the construction of the improvements. The engineering staff shall consist of engineers, inspectors, and assistants as may be necessary to carry on all of the engineering work required in connection therewith, in an efficient and expeditious manner.
 
 
 15
 b. Design Services. Design services for the project shall include the preparation of preliminary and final plans for the Project, as herein specified, together with all specifications and related documents required for the construction of the Project by the City's construction contractor.
 
 
 16
 (R., Def's. Ex. BA-BB 952). (Emphasis supplied).
 
 
 17
 Shortly after Miller started working on the project it encountered an extremely muddy unstable area which would not support the sewer pipe in its natural condition. Contract Change Order No. 1 was therefore prepared by Engineers and executed by Miller and City. This change order provided, inter alia:
 
 
 18
 This Change Order adds Item 18 Crushed Stone to the contract. This item is added to provide compensation for material required to provide adequate support for pipe to be installed in ditch areas where the nature of the base material is such that other available material is inadequate to satisfactorily support the pipe. Such areas of unstable material could not be anticipated in advance of actual excavation.
 
 
 19
 Under this item, crushed rock will be furnished and installed as backfill to the normal trench grade in those areas where the material encountered at the planned trench bottom is unsuitable for supporting the pipe. Use of crushed stone in such areas of unusual nature not anticipated in normal trenching shall be authorized by the Engineer.
 
 
 20
 The crushed stone shall have a nominal size of 11/2 inch with variations to accommodate actual conditions encountered to be authorized by the Engineer.
 
 
 21
 (R., Def's. Ex. BA-BB 3B). (Emphasis supplied).
 
 
 22
 After implementation of Change Order No. 1 Miller proceeded to install approximately 93% of the line, utilizing a large backhoe and crushed rock varying in size from 11/2 to 4 to stabilize muddy, unstable areas as encountered. During the course of installing the line Miller was paid on a periodic basis in accordance with estimates prepared by Engineers for completed work inspected and approved by Engineers. Under Miller's contract with City a 10% retainage was withheld pending completion and acceptance of the line by City.
 
 
 23
 After completing 93% of the line, Miller was unable to complete the remaining 7% which extended through extremely unstable areas. At this point in time, Miller claimed it was impossible to stabilize the muddy areas utilizing crushed rock. Miller subsequently made repeated written and oral requests of Engineers for a design change as to different methods of stabilization, indicating that it would not proceed further until a design change was provided or specific instructions were received on how to complete the project.
 
 
 24
 Despite Miller's repeated requests, Engineers did not provide specific instructions or authorize a design change. Rather, Engineers ignored Miller's repeated requests for guidance, indicating only that Miller should continue to use crushed rock to stabilize the extremely muddy areas. Engineers' inspector, John Terrell, who was assigned to the project, indicated that he talked to Engineers, his employers, about the problem several times, that he was concerned about it (R., Vol. IV, at p. 507) and that he was told by Engineers "not to worry about it, just keep trying". (R., Vol. IV, at p. 511).
 
 
 25
 City subsequently, upon the advice of Engineers, denied a design change and terminated Miller for failure to proceed on the project. Miller then canceled its contract with City, alleging that City had failed to make a timely payment on the last periodic estimate. City thereafter relet the contract to another firm, Utility Contractors, who, by utilizing a "clamshell" and large 18 riprap rock, was able to complete the contract. In completing the project, Utility Contractors proceeded on its own, without actively soliciting the advice of Engineers. Virgil McGuire, Utility Contractors' foreman, who operated a "clamshell" to remove the soupy unstable material from the pipeline ditch and also place the large 18 riprap in the ditch, testified that it would have been impossible to complete the project with the crushed rock specified by Engineers in Change Order No. 1. Robert Kuhn, area manager for Utility Contractors, stated that they did not even try to stabilize the pipeline ditch with 11/2 rock because they felt that it was better to stabilize the ditch with larger rock.
 
 
 26
 Upon Utility Contractors' completion of the line and acceptance by the City, City paid it $439,016.90. Prior thereto, City had paid Miller $1,288,027.29. Thus, the total outlay amounted to.$1,727,043.48, or $286,651.48 above Miller's original contract price of $1,540,392.00 as adjusted by several change orders agreed upon by Miller and City and authorized by Engineers during Miller's work on the project.
 
 
 27
 After Hydro Conduit Corporation initiated this suit against Miller and its surety, and, alternatively, against City, for pipe delivered to the project site but not paid for, Miller cross claimed against City for its withheld retainage, lost profits on the uncompleted portion of the project, and damages caused by the delay in not receiving adequate instructions with which to complete the project. City also filed a cross claim against Miller seeking damages for Miller's failure to complete the project, for defective work on that portion of the project which Miller completed, for not completing the project in a timely manner, and damages incurred by City by virtue of lawsuits filed against it by property owners along the project's right of way whose property had been damaged by Miller's installation of the line. City also filed a third party complaint against Engineers requesting indemnity from any judgment awarded to Miller in view of Engineers' failure to provide Miller adequate directions as provided for in City's contract with Engineers.
 
 
 28
 Trial was to the court. Extensive testimony and evidence was presented by each of the parties relative to the respective obligations and responsibilities of Miller and Engineers vis a vis: the proper manner in which to stabilize the soupy muddy areas; the limitations placed upon Miller by Change Order No. 1; Engineers' repeated refusal to direct or supervise Miller beyond "use more rock"; the apparent relative ease with which Utility Contractors completed the project by utilizing a "clamshell" instead of a backhoe and 18 riprap rather than the 11/2 to 4 crushed rock used by Miller; the degree to which City's additional costs in completing the project were directly related to the soupy, muddy unstable areas, and/or Engineers' refusal to help Miller; and, the proper allocation of the additional costs between Miller, City, and Engineers.
 
 
 29
 Within its ruling that Miller was entitled to receive its retainage and damages for loss of use of its equipment, that City was entitled to receive a credit from Miller for repairs and cleanup by Utility Contractors on some of Miller's work, and that City was entitled to judgment over against Engineers for the damages awarded to Miller for loss of use of its equipment, the court specifically found, inter alia: it was preposterous and unreasonable for Engineers to expect Miller to stabilize the very muddy areas with 11/2 rock; Engineers acted unlawfully and "completely rude" in ignoring Miller's repeated requests for help; Engineers' actions were a breach of its contract with City and inexcusable; since prior to excavation the very muddy unstable areas were only known to God, City must bear the added cost of completing the project; just because Utility Contractors completed the project using larger rock does not mean that Miller was also obligated to do so when, as here, Miller did the best it could in accordance with the contract documents; Mr. McGuire, Utility Contractors' foreman testified that you could not stabilize the problem trench areas with 11/2 rock and "there is no witness that has testified that said you can" (R., Vol. VI, at p. 15); and that Miller "walked out on this contract because of impossibility of performance." (R., Vol. VI, at p. 17).
 
 
 30
 In its final judgment, the court modified its prior oral findings, and ordered that: Miller's total judgment of $209,494.75 against City must be reduced by City's credits of $80,050.00, reducing Miller's recovery to a net judgment of $129,445.75; Miller is entitled to reasonable attorney fees of $25,000; Miller must defend City on any action initiated as a result of its work on the project; and City is entitled to recover $22,500 from Engineers.
 
 
 31
 On appeal, City contends: (1) the trial court erred in holding that Miller was relieved from liability on its contract with City because of impossibility of performance; (2) the trial court failed to award City adequate amounts to compensate it for damages caused by Miller's inadequate work; (3) Miller failed to prove the elements of its action; and (4) the trial court failed to award City the damages it incurred as a result of Engineers' failure to adequately instruct Miller.
 
 
 32
 Engineers contend: (1) the court erroneously excused Miller from performance on the basis of impracticability; (2) the trial court erred in rendering judgment in favor of Miller against the City and over against Engineers for loss of use of equipment after impossibility was declared; and (3) Engineers' contract with City did not require Engineers to control the contractor as to methods or techniques for performing the work.
 
 
 33
 At the outset we observe some of the basic rules governing our review. In a diversity of citizenship case the federal district court sits as a state trial court and applies the law of the forum state. Hackbart v. Cincinnati Bengals, Inc., 601 F.2d 516 (10th Cir. 1979), cert. denied, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 188 (1979). The federal district court, as trier of fact, has the responsibility of weighing the credibility of the witnesses. Bingham v. Bridges, 613 F.2d 794 (10th Cir. 1980). On appeal, the reviewing court must view the evidence in the light most favorable to the prevailing party. Rasmussen Drilling v. Kerr-McGee Nuclear Corp., 571 F.2d 1144 (10th Cir. 1978), cert. denied, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978). A judgment may be affirmed on any ground arising from the record. Casto v. Arkansas-Louisiana Gas Company, 597 F.2d 1323 (10th Cir. 1979). Findings of a trial court will not be disturbed on appeal unless they are clearly erroneous. Volis v. Puritan Life Insurance Company, 548 F.2d 895 (10th Cir. 1977), Fed.Rules Civ.Proc. rule 52, 28 U.S.C.A. Finally, the appellate court may, in addition to concluding that the legal ground or conclusion relied upon by the trial court is correct, hold and conclude that one or more additional grounds advanced by the prevailing party are likewise correct as a matter of law in support of the judgment. Moore's Federal Practice, Vol. 5A, § 52.03(2), p. 2663; United States v. Hunt, 513 F.2d 129 (10th Cir. 1975). This rule blends with the rule that a judgment correct in ultimate result or effect will not be disturbed on appeal although the trial court relied upon a wrong ground or gave a wrong reason. Securities Commission v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); Pound v. Insurance Co. of North America, 439 F.2d 1059 (10th Cir. 1971).
 
 I.
 
 34
 City contends that the trial court erred in holding that Miller was relieved from liability on its contract with City because of impossibility of performance[2] and that Miller was not entitled to recover damages because it failed to prove its case. We disagree.
 
 
 35
 It is uncontested that none of the parties anticipated that the muddy, very unstable areas within the trench would appear and that such areas would be incapable of supporting the pipeline. Change Order No. 1, prepared by Engineers and signed by Miller and City provided, inter alia: "Such areas of unstable material could not be anticipated in advance of actual excavation." It is also uncontested that after the implementation of Change Order No. 1 Miller made extensive and repeated attempts to stabilize the unstable areas by utilizing crushed rock in accordance with Change Order No. 1 and the Engineers' instructions, all to no avail. During Miller's work on the project many sections of pipe were laid two to four times and one section of approximately one hundred feet was taken out and relaid twenty times without success. (R., Vol. IV, at pp. 267-269).
 
 
 36
 Under the law of Oklahoma, as applied to the facts herein, the trial court properly held that Miller was relieved of liability under its contract with City because of impossibility of performance. In Kansas, Oklahoma & Gulf Railway Company v. Grand Lake Grain Company, 434 P.2d 153 (Okl.1967), the Supreme Court of Oklahoma opined:
 
 
 37
 In 84 A.L.R.2d § 18 et seq. there is an extended annotation dealing with the question of impossibility of performance as a defense in actions for damages for breach of contract. It is there pointed out that the more modern rule of supervening impossibility means not only actual strict impossibility, but impracticability arising from extreme and unreasonable difficulty, loss injury or expense which may be involved.
 
 
 38
 "Where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose, and neither agrees to be responsible for its continued existence and availability, the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist and be available for the purpose, the contract shall be dissolved and the parties excused from performing it."
 
 
 39
 434 P.2d at pp. 158-159.
 
 
 40
 As indicated above, none of the parties herein anticipated that the trench bottom would become and remain so unstable that it would not support the sewer line. Thereafter, with the implementation of Change Order No. 1, Engineers were steadfast in their belief that the trench could be stabilized by using crushed rock. Miller refused to continue with the contract only when it became apparent, after numerous and repeated efforts to stabilize the trench in accordance with Engineers' instructions, that the trench would not stabilize. Under such circumstances, and the law of Oklahoma, Miller was relieved from its contractual liability with City and the trial court correctly so found. Engineers repeatedly wrongfully refused to instruct Miller and/or to change the plans and specifications. The trial court's finding in this regard was not clearly erroneous. See B's Company, Inc. v. B. P. Barber & Associates, Inc., 391 F.2d 130 (4th Cir. 1968).
 
 
 41
 Furthermore, under the law of Oklahoma, Miller was entitled to rely on the plans and specifications prepared by Engineers and to thereafter recover its damages and losses incurred as a result of the inadequacy of same. In Woods v. Amulco Products, 205 Okl. 34, 235 P.2d 273 (1951), the Supreme Court of Oklahoma opined:
 
 
 42
 He calls attention to the statement in Oklahoma City v. Derr, supra, as follows: "A different rule applies where the contractor must build and complete a structure according to the plans and specifications by the owner. The contractor will not be required to bear extra expense resulting from the performance of the contract on account of defects in the plans and specifications prepared and submitted by the owner." (Citing numerous authorities.) (109 Okl. 192, 235 P. 218, 221.) He also calls attention to State v. Commercial Insurance Co., 125 Neb. 43, 248 N.W. 807, 88 A.L.R. 790, and to the A.L.R. annotation to that case shown at 88 A.L.R. p. 797, wherein the general rule is stated as follows: " * * * the rule has become well settled, in practically every American jurisdiction in which the matter has been involved, that a construction contractor who has followed plans and/or specifications furnished by the contractee, his architect or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results at least after the work is completed solely from the defective or insufficient plans or specifications, in the absence of any negligence on the contractor's part, or any express warranty by him as to their being sufficient or free from defects." The rule as announced above is supported by numerous citations, including Oklahoma City v. Derr, supra.
 
 
 43
 235 P.2d at p. 276.
 
 
 44
 Oklahoma's law holding that a contractor is entitled to rely on an owner's plans and specifications and that the contractor is not thereafter liable to the owner for loss or damage which results solely from the insufficient or defective plans is in accord with numerous court decisions. See United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), holding that a contractor who is bound to build according to plans and specifications prepared by the owner will not be responsible for the consequences of defects in the plans and specifications; Centex Construction Co., Inc. v. James, 374 F.2d 921 (8th Cir. 1967), holding that where one party furnished plans and specifications for a contractor to follow in a construction job, he impliedly warrants their sufficiency for the purpose in view; and Natus Corporation v. United States, 371 F.2d 450 (Ct.Cl.1967), holding that where government authors specifications it warrants that if specifications are complied with, satisfactory performance will result.
 
 
 45
 Miller's position is substantially strengthened by its repeated efforts to receive assistance in overcoming the unstable areas. In Northern Corporation v. Chugach Electric Association, 523 P.2d 1243 (Alaska 1974), the Supreme Court of Alaska stated:
 
 
 46
 After Northern (contractor) had notified Chugach that it did not believe the contract could be performed by the ice haul method and Chugach continued to insist on such performance, the parties no longer were in the posture of neither warranting the specification more than the other. We hold that under the circumstances here involved, where Chugach had the technical expertise to inform itself as to ice conditions prior to insisting on performance, Chugach thereafter impliedly warranted that method in the same manner as if it had unilaterally established the specification at the time the contract was entered.
 
 
 47
 523 P.2d at p. 1246.
 
 
 48
 In that case, as here, despite repeated requests and assertions that the contract could not be performed in accordance with the plans and specifications, the owner refused to change them. There, as here, the owner was thereafter obligated to bear the losses or damages incurred as a result of compliance with the plans and specifications.
 
 
 49
 We hold that the trial court properly found that it was impossible for Miller to perform the contract according to City's plans and specifications as supplied by Engineers and that Miller, contrary to City's contention, proved its case.
 
 II.
 
 50
 Engineers contend that the trial court erred in rendering judgment in favor of Miller against City and over against Engineers for loss of use of equipment after impossibility was declared. In a related contention, City urges that the trial court failed to render it an adequate award for the damages it incurred as a result of Engineers' failure to adequately instruct Miller.
 
 
 51
 Underlying Engineers' contention is the argument that the trial court erroneously determined the contract to be impossible of performance, inasmuch as Utility Contractors completed the project; accordingly, Miller was not entitled to any damages for loss of use of equipment. The fact that Utility Contractors was able to finish the project is of no moment when, as here, it is uncontested in the record that: Utility Contractors' foreman proceeded without discussing the project with Engineers; Utility Contractors completed the project by utilizing 18 riprap which Engineers did not authorize Miller to use; and Utility Contractors personnel testified that it would have been impossible to complete the project utilizing the crushed rock specified in Change Order No. 1.
 
 
 52
 Under Oklahoma law, an architect's undertakings do not imply a guarantee of perfect plans or satisfactory results, but an architect may be held liable for failure to exercise reasonable care and professional skill in the preparation and execution of plans according to its contract. Smith v. Goff, 325 P.2d 1061 (Okl.1958). In Smith, supra, the Oklahoma Supreme Court opined:
 
 
 53
 The issue so far as the architects are concerned was whether they used that degree of professional care required of them in the origination of the plans and specifications and in the supervision of the construction. The court instructed the jury on this issue. The use of various materials in the building which were not the same as those in the original specifications presented the question of the architects' professional judgment as to the suitability of the material for the purpose. The same is true concerning the methods employed "to maintain the initial effect of the building." So also, concerning the architects' supervision of construction. Architects are only required to exercise ordinary professional skill and diligence and to conform to accepted architectural standards; their contracts do not guarantee perfect plans or satisfactory results. Architects are only liable for failure to exercise reasonable care and professional skill in the preparation and execution of their plans according to their contract. Ressler v. Nielsen, N.D., 76 N.W.2d 157.
 
 
 54
 325 P.2d at p. 1064.
 
 
 55
 No less a standard should be applied herein.
 
 
 56
 The trial court found, (and this is not contested on appeal) that Miller repeatedly sought Engineers' help to no avail:
 
 
 57
 And now then we get to the real trouble here and that was the total failure of the engineering concern, architects and engineers to provide instruction and help when this impossible situation was encountered. Not only did they act unlawfully, it was completely rude to just ignore these letters, time after time after time the contractor almost praying for help, I want to do it if you will just tell me. It would be ignored. Now, the inspector on the job, Terrill, is a good man. I think he wanted to be helpful but when he would call the office and talk to Connor, I believe it was, the man that was supposed to be the field supervisor, all he would get was just tell them to keep trying, tell them to keep trying. That's not the kind of help the architect is supposed to provide under these circumstances. They let the City down and, of course, the contractor and for those faults, although I must award judgment against the City, there is no way, I don't believe legally that I could award any judgment in favor of the contractor against the architect because you don't contract with them, you contract with the City, so anything you have got coming must come from the City but then in turn I am going to make the architect pay the City because this is not something that the City should be held responsible for.
 
 
 58
 (R., Vol. VI, at p. 10).
 
 
 59
 Under such circumstances, the trial court properly awarded Miller's judgment against the City for loss of use of its equipment over against Engineers. Clearly, Engineers did not exercise reasonable care and professional skill in preparation and execution of the plans in accordance with its contract with City.
 
 
 60
 We further conclude that the $22,500 awarded over against Engineers does not adequately compensate City for Engineers' repeated failure to adequately and properly instruct Miller. Our review of the record does not support Engineers' categorical statement that City's damages were uncontroverted, the result of Miller's improper work, incompleted work, additional engineering fees, and the defense of lawsuits which Miller was obligated to defend, in total amount of $266,925.31. That amount may, upon remand, be determined to be the actual amount of damages incurred by City as a result of Engineers' failure to properly perform in accordance with its contractual obligations which should be charged against Engineers in favor of City. This matter is one to be considered and determined by the trial court upon remand. Thus, upon remand, the trial court should undertake such further proceedings necessary to determine the additional costs and expenses incurred by City in completing the project which resulted from Engineers' persistent refusal to exercise reasonable care and professional skill in working with and advising Miller. These costs, if any, shall be in addition to the damage award of $22,500.00, supra, already assessed against Engineers in favor of City.
 
 
 61
 In summary, the judgment entered in favor of Miller in the amount of $129,445.75 and attorney fees of $25,000.00 is affirmed. The $22,500.00 judgment awarded City against Engineers is also affirmed. The trial court's order requiring that Miller defend City on any action initiated as a result of its work on the project is affirmed except for damages attributable to Engineers' failure to properly instruct and advise Miller relative to the project. The cause is remanded for further proceedings with instructions to the trial court to make a determination relative to what, if any, additional damage award is due City from Engineers as a result of Engineers' failure to properly instruct and advise Miller relative to the project in accordance with the project contract.
 
 
 
 *
 Of the United States District Court for the District of Colorado, sitting by designation
 
 
 [1]
 Although the suit was initiated by Hydro Conduit Corporation, the suppliers of the pipe utilized for the line, the judgment entered in its favor is not before us on appeal
 
 
 [2]
 Engineers make a similar contention on the basis of impracticability as noted, supra