**William H. GLEASON, Appellant,**

v.

**The TITLE GUARANTEE COMPANY, Appellee.**

**No. 18998.**

United States Court of Appeals
Fifth Circuit.

May 8, 1963.

Rehearing Denied June 15, 1963.

Charles Cook Howell, Jacksonville, Erskine W. Landis, DeLand, William M. Howell, Jacksonville, Fla., for appellant.

L. S. Bonsteel, Earl D. Waldin, Jr., Miami, Fla., for appellee.

Before TUTTLE, Chief Judge, and JONES, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

On the original hearing this Court affirmed a judgment based on a directed

verdict in favor of The Title Guarantee Company against William H. Gleason, a title examining attorney, for damages sustained when various mortgages guaranteed as first mortgages on Gleason's certification of clear title, proved to be subordinate to other mortgages.

## I.

The appellant contends that since the evidence before the district court on the hearing for summary judgment was substantially the same as the evidence on which the directed verdict was granted, the motion for a directed verdict should have been denied.

■ A motion for a summary judgment is similar to a motion for a directed verdict in the sense that both motions function in the interest of saving money, time, and effort when there is no genuine issue of material fact. But the motions operate differently and produce different results. Thus, Professor Moore points out:

> "[When a trial court has improvidently granted a summary judgment] time and effort have been spent only for the purpose of getting to trial. * * *

> "Where the defendant's motion for directed verdict is sustained at the end of plaintiff's case the judge has at least heard testimony at a live trial, but if the trial court improperly sustains the motion reversal follows with its attendant delay and expense. Much the same comment applies where a verdict is actually directed at the close of the entire case. To remedy this evil, Rule 50(b) provides for an automatic reservation of decision on the motion for directed verdict made at the close of the entire case, which permits a verdict to be taken and decision on the motion subsequently to be made. But if the trial court errs in deciding this motion the appellate court need not remand for a new trial, if the provisions of Rule 50(b) have been properly fol-

lowed in the district court." 6 Moore's Federal Practice § 56.02 [10]

Sound practical reasons therefore may justify a trial judge's denying a motion for summary judgment even on the identical evidence supporting his granting a directed verdict.

■ Here the district judge (who was not the judge who heard the case on the merits) denied the plaintiff's motion for a summary judgment on the ground that there was a dispute as to material facts on the issues of the terms of the employment contract and whether the defendant failed to perform the contract. As the trial judge said in stating to the jury his reasons for directing a verdict in favor of the plaintiff:

> "Judge Freeman held that the defendant should be granted, and he did grant him, an opportunity to present evidence in an effort to show that the terms of the employment agreement, under which he was working, was modified as a result of a situation that had developed in and around Melbourne in a real estate boom that was going on, and when dealers in land couldn't get abstracts promptly before the land sales transactions had to be closed to meet the needs of purchasers. Defendant had that opportunity here. The Court has allowed defendant to offer all the testimony tendered by defendant bearing upon the subject, and the Court finds and holds that the defendant has failed to prove in this case, or to submit evidence in this case that proves that the contract of employment between the plaintiff and defendant was in any way modified by reason of the real estate boom around Melbourne,"

We have re-read the record. We are still of the same opinion as the trial judge.

## II.

Suncoast Home Title Company and Guardian Title Company were the Florida agents of the Title Guarantee

Company of Baltimore. Their role was to prepare a title policy based on Gleason's certificate of title. The appellant contends that Peebles,[1] who countersigned for Suncoast as "authorized officer or agent", was Title Guarantee's agent, or at least clothed with apparent authority to represent the plaintiff and receive information how Gleason was doing his work; and that Gleason informed Peebles that he was not making examinations but was depending on the local title companies. This is a material issue of fact, so appellant argues, that should have been submitted to the jury.

■ The appellant did not press this argument in his original brief or his reply brief. Peebles did not testify, and the record contains few references to Peebles.[2] The record shows that Gleason talked with Peebles about "the reason for the delay and problems we were having in connection with titles and examination" and that Gleason was "depending on the title companies". But, there is no evidence that he informed Peebles or anyone else that he was relying entirely on the abstract companies and that their information was not up to date at the time of his certification or at the date of closing. Gleason himself did not know that the tract book on which the title company relied was six weeks behind. He did not and could not, therefore, have communicated this crucial fact to Peebles. Thus, even if Peebles had the authority to waive any of the terms of Gleason's contract of employment—and there is nothing in the record to show that he had such actual or apparent authority—he lacked the knowledge necessary for a conscious waiver of the practice that caused the injury.

1. The name appears as "Pebbles" in the printed record and in this Court's first opinion.

2. The testimony most favorable to the appellant's position is Mr. Gleason's testimony, as follows:
"Q. Mr. Gleason, did you ever have any conversations with any representative of the First National Bank of Dunedin, or Sun Coast Title Company or the J. I. Kislak Company or the Guardian Title Company in connection with the title problems that you had and the manner and method in which you were to operate?
"Mr. Dyer:
"May I have the witness specify the date."
"The Court:
"Yes, sir.
"Mr. McDonald:
"That is a broad question.
"A. In either May or June, I will give that as an approximate date of 1956, I recall driving over to Dunedin and discussing with Mr. Flowers and Miss Hutchinson and Mr. Pebbles, at his house, concerning the reason for the delay and problems we were having in connection with titles and examination in Brevard County at that particular time. I recall discussing it to the best of my recollection with Mr. Pebbles at his house. I remember he had just had an operation and I went over to his house to talk to him about it. Then, later Mr. Lowe from Kislak would make frequent trips to Melbourne to discuss the problems of abstracting and titles in Brevard County. In fact, I would say he was in Melbourne once or twice a week from July through October.
"Q. Did you disclose the situation you say you did disclose the situation to Mr. Pebbles and Mr. Lowe?
"A. To the best of my recollection, yes, sir.
"The Court:
"That is a little too broad. The statement you made about the difficulties. The answer to his question calls for a broad answer. The point is, did you let these people, the mortgage people which you were working for know that you were making examinations, not on your own part, but depending on title companies?
"The Witness:
"Based on a written abstract.
"The Court:
"Based on a written abstract for personal examination, or doing it the way you were doing it?
"The Witness:
"Yes, sir, I did.
"The Court:
"To whom?
"The Witness:
"Both Mr. Lowe and Mr. Pebbles."

### III.

■ The appellant argues strongly that in its original opinion the Court erred in not applying the Florida standard of care applicable to an action against a professional man. Counsel stresses particularly that Gleason's duty to the plaintiff must be measured by the community standards of professional conduct prevailing in Brevard County at the time Gleason did his work. Thus, a physician's duty is to exercise skill "according to the standard of those who are qualified by training and experience to perform similar services in the community." Olschefsky v. Fischer, Fla.App. 3, 1960, 123 So.2d 751. See Davis v. Virginian R. Co., 1960, 361 U.S. 354, 80 S.Ct. 387, 4 L.Ed.2d 366. In State ex rel. Florida Bar v. Oxford, 1961, 127 So.2d 107, the Florida Supreme Court declined to disbar or discipline a lawyer who had filed pleadings for both the opposing parties in thirty-nine divorce suits, because such action had been the practice in the locality where he practiced for many years.

■ This Court and the trial court had no quarrel with the law the appellant cites. As the trial judge said, "Except for the situation that developed in Brevard County during the land boom, * * * [this case] does not present any question at all." The rulings on evidence were all in favor of admissibility of the defendant's proffered evidence. The defendant had a free hand in his attempt to show that local custom in Brevard County altered the attorney's obligation on his contract. We find again, as did the trial judge, that "There is nothing in this record that leads this Court to believe that the plaintiff had any knowledge of the fact that the defendant was failing to perform for it the complete obligation specified in the contract."

■ If it is a custom in a community for attorneys to conduct the type of title examination the defendant conducted and if a title insurer is willing to run the risk resulting from such an examination, it can certainly do so. But in the record before us there is no evidence whatsoever that the community condoned the absence of a proper caveat to the certification which would indicate the time lag between the date of the attorney's last reliable information and the date of the certificate. There is no evidence that Title Guarantee knew or should have known that it was running the type of risk to which it was exposed.

### IV.

■ The plaintiff's costs of removing the prior encumbrances amounted to $83,978.57. The face value of the collateral the plaintiff acquired was $63,562.78. The defendant is liable for the difference between the amount of the plaintiff's loss and the fair value of the collateral. It is for the district court, bearing in mind the equities, to determine the fair value of the collateral. It is also for the district court to decide if the collateral should be sold and, if so, under what conditions. The record provides no basis for this Court to determine these matters. The case is remanded to the district court for a redetermination of the amount of the damages.

Except as modified with respect to the determination of damages, the application for a rehearing is

Denied.