Emma SANDOVAL, as Personal Representative of the Estate of John Sandoval, Deceased, Appellant,

v.

U. S. SMELTING, REFINING & MINING COMPANY et al., Appellees.

No. 75–1787.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted July 28, 1976.

Decided Nov. 12, 1976.

Ray M. Vargas, Albuquerque, N. M., for appellant.

Edward E. Triviz, Las Cruces, N. M., for appellees.

Before SETH, HOLLOWAY and McWILLIAMS, Circuit Judges.

SETH, Circuit Judge.

Plaintiff-appellant filed this wrongful death action in state court alleging that appellees negligently caused the death of her husband in a mine in Grant County, New Mexico. The case was removed to the United States District Court for the District of New Mexico, where trial began. At the conclusion of appellant's case, the trial court held that plaintiff's own evidence of decedent's contributory negligence precluded recovery as a matter of law, and directed a verdict in favor of appellee. This appeal challenges the correctness of the court's ruling.

The measure of the sufficiency of the evidence to go to the jury in a diversity case is a matter of federal law. *Kiner v. Northcutt,* 424 F.2d 222 (10th Cir.). In considering the motion for a directed verdict the trial court and appellate courts should view the evidence in the light most favorable to the party against whom the motion is made. *Oldenburg v. Clark,* 489 F.2d 839 (10th Cir.); *Weeks v. Latter-Day Saints Hospital,* 418 F.2d 1035 (10th Cir.); *Gulf Insurance Co. v. Kolob Corp.,* 404 F.2d 115 (10th Cir.). The standard employed upon review was expressed by this court in *Taylor v. National Trailer Convoy, Inc.,* 433 F.2d 569 (10th Cir.), in the following terms:

"A directed verdict is proper only where the evidence and all the inferences to be drawn therefrom are so patent that

minds of reasonable men could not differ as to the conclusions to be drawn therefrom." 433 F.2d at 571–72.

*See also Stiner v. United States,* 524 F.2d 640 (10th Cir.); *Bertot v. School District No. 1, Albany County, Wyo.,* 522 F.2d 1171 (10th Cir.); *Wright v. American Home Assurance Co.,* 488 F.2d 361 (10th Cir.).

Appellant's husband, John Sandoval, was a miner of twenty years experience and was employed at appellee's mine in New Mexico. At the time of the accident, he was on the payroll of Akers, a contract miner. Akers had contracted with appellee to mine certain levels or certain drifts in the mine. Under this contract, he was to provide the labor and the hand tools. The heavy equipment was provided by appellee. Akers was reimbursed for the cost of workmen's compensation coverage. The miners worked on a wage with an incentive increment. The miners were under the immediate supervision of the contract miner. The statutory employee issue was raised by motion by appellee, but does not appear to have been resolved.

On the day of the accident, John Sandoval and his working partner, Concepcion Villalobos, were instructed to "muck out" an area, where a preceding shift had blasted down some rock. Sandoval and Villalobos "wetted down" the area with water hoses and dislodged loose rocks remaining after the blast. While engaged in these activities, Sandoval and his partner were directed by their supervisors to continue to remove loose ore, and to prepare to remove by blasting a low section of the ceiling. Sandoval and Villalobos then proceeded to drill holes in the roof, and continued to "muck out" loose ore. When boulders too large for the mucking machine were encountered, they would break them with an explosive charge. As more loose ore was removed from the floor, they thought that they might have difficulty in reaching the holes previously drilled on the roof of the cavity to load them. Sandoval and his partner thus loaded the holes by reaching from the top of the ore pile. The rounds were fused and connected with an igniter cord.

At this point, a foreman came to inspect the work. He noticed that Villalobos was "tying down" the charges some two and one-half hours before the end of the shift, and instructed the workers not to blast the overhead rounds until the end of the shift which was the usual time for all blasting.

Sandoval and Villalobos then continued to remove loose ore from the floor of the cavity until they encountered another boulder. Villalobos testified that the boulder could have been rolled out of the path of the mucking machine but that he and Sandoval instead decided to break it with a charge. After removing the mucking machine from the area, they placed a charge, lit the fuse to blast the boulder, and retreated to guard the entrances to the station. The charge was detonated, and Villalobos testified that some five or six minutes after the blast, he heard the mucking machine start up again. Villalobos was then walking away from the station to get some additional ore cars; he then also heard four additional blasts and knew that some of the overhead rounds had detonated. Upon returning to the station, Villalobos found Sandoval covered with loose rock, and he was dead by the time the rock was removed.

As previously noted, at the close of appellant's case, the trial court granted appellees' motion for a directed verdict holding that ". . . even assuming that there was sufficient evidence of negligence of the defendants to create a fact question for the jury, plaintiff's own evidence shows contributory negligence as a matter of law."

■ Appellant here contends the trial court erred by granting a directed verdict when it had earlier denied appellee's motion for summary judgment. She argues that since evidence garnered at the discovery stage was virtually identical to that introduced at trial, the court's directed verdict, when summary judgment was previously denied, was improper. However, a denial of summary judgment does not rule out the possibility of a directed verdict. *Gross v. Southern Railway Co.,* 446 F.2d 1057 (5th

Cir.); 5 Moore, Federal Practice (2d ed. 1969) § 50.03(4), p. 2338.

Appellant presented her evidence on the theory that appellee had negligently failed to provide a safe place of employment for her husband and that such negligence was the proximate cause of his death. The testimony must be recounted in some detail. The record shows that Richard P. Gerwels, appellee's manager, was called as an adverse witness by appellant. He testified that the defendant had contracted with David Aker for the operation of the 1300-foot level of the mine. If there were "gross violations" of the safety code, appellee would call them to Aker's attention. Gerwels' testimony on direct examination consisted for the most part of a general discussion of the operation and production schedule of the mine. On cross-examination, he testified that the operation of different areas of the mine depended on the particular requirements of the contractor. Gerwels was then examined on the particular incident in question:

"A: Blasting a boulder underneath a loaded round is contrary to all accepted safety practices by managers and also any supervisors who might be aware of it, any experienced miner should never do this.

"Q: Why is that?

"A: It's dangerous. It's apt to set off the holes up above.

    *     *     *     *     *     *

"Q: Is there any particular waiting time following setting off explosives in a mine before returning to the site?

"A: It should never be less than fifteen minutes and preferably a half hour . .

"Q: Had you, and I mean this, you personally, while working for U.V. become aware of any such blasting procedure having been done before August 30, 1971 of a boulder underneath loaded rounds?

"A: No, sir, and if I had, it would have been promptly stopped. This is contrary to all safety practices."

Appellant then called William T. Boies, the chief engineer for appellee, as an adverse witness. Boies supervised the engineering department of appellee, and was also charged with safety supervision of the mine, including the 1300-foot level. On direct, he testified that he normally did not give safety instructions to any of the contractors or miners but would correct safety violations when he saw them. He stated that blasting was normally done at the end of a shift but could be done earlier if arrangements were made. Boies then testified to the ventilation system in the mine at the 1300-foot level. On cross-examination, Boies testified that the individual contractors had safety engineers of their own, and that the safety people attempted to coordinate safety efforts. In relation to the accident, he testified:

"Q: What is the nature of blasting a boulder just per se in isolation without any loaded charges?

"A: All by itself, this is a secondary blasting situation. It is the disposition of a boulder that you hadn't planned on to—had to break up so that you could handle it and proceed with the work.

"Q: In connection with the loaded rounds, is there any particular practice whether in terms of Code or otherwise in mining as to once they are loaded, what particular course is to be taken?

"A: It is a matter of practice, a matter of law, matter of common sense, you would not blast anything in the proximity of loaded rounds that could be initiated by the secondary blasting. You are not even to work in the immediate vicinity of loaded rounds."

He also stated that the safety brochure available to miners specified that they should not return to an unventilated blasting site for at least thirty minutes. On cross-examination, it was brought out that Boies had testified at the hearing following the accident that: "One of the questions that was a contributing factor to the accident here is the fact of the ventilation. I think the company should make very much

harder efforts to keep these places well ventilated. . . . "

Appellant next called Merejildo Rivera who was the shift manager employed by Aker at the time of the accident. Rivera testified that at the beginning of the shift, he and Pete Martinez went to the area in question and found Sandoval and Villalobos wetting down and removing loose ore. The supervisors told them to level a portion of the ceiling in the cavity. He testified that a miner should usually wait thirty minutes before returning to the area of a primary explosion, but could return to the site of a secondary blast within five or ten minutes. He noted that the practice in the mine was that secondary or boulder blasting could be done at any time during the shift, but that a regular primary blast could be done only at the end of the shift. Relative to the accident, Rivera testified that he later returned to the site and saw Sandoval and Villalobos tying together the overhead rounds with fuses. He thought that the workers were simply going to continue to remove loose ore from the cavity for the two hours remaining on the shift. Rivera specifically told them not to blast the overhead rounds until quitting time. On cross-examination, Rivera stated that he was referring to a prohibition on blasting the overhead rounds—he stated that he was unaware that the workers had been using secondary blasts to remove large boulders on the ground. In reference to a meeting between Rivera and Villalobos after the accident, the following exchange occurred:

"Q: And Villalobos, didn't you get after Villalobos that he should—he and Sandoval should have more sense than to have blasted that way?

"A: I did.

"Q: Did Villalobos tell you he just plumb forgot or what?

"A: Just said—he said he wasn't thinking—at the time, they weren't thinking about the loaded rounds on top."

The deposition of David Romero, Aker's safety engineer, was then read into the record. Romero stated that he had run a number of safety meetings dealing with the use of explosives but could not remember whether the decedent had attended. He stated that a miner absolutely should not blast boulders underneath loaded rounds.

The deposition of Pete Martinez, general foreman at the 1300-foot level at the time of the accident, was also introduced. He stated that blasting boulders underneath loaded overhead rounds was contrary to mining practice, that he had never seen any miner do it before, and that if he was aware of the practice he would immediately stop it. He testified that the decedent was "pretty careful" in his previous use of explosives.

Appellant's primary witness was Concepcion Villalobos, the decedent's work partner at the time of the accident. Villalobos testified on direct that he and Sandoval were wetting down the station and removing loose ore when the supervisors told them to level a portion of the ceiling. He noted that he and Sandoval worked on a production incentive bonus system by which they would receive more money if they finished the station on a certain date, in this case, the day following the accident. He stated that there was no ventilation where they were working. Villalobos drilled and loaded the holes in the roof of the ceiling and continued to remove loose ore from the floor of the cavity. He testified that he was "pretty sure" that Rivera, his supervisor, was aware that they had been blasting boulders after the overhead rounds were loaded, and that Rivera later in the day only asked them how they were doing. He stated that after Rivera left, they tied the loaded rounds together with an igniter cord and continued to remove loose ore. The workers then encountered another boulder and attached explosives. On direct, Villalobos testified:

"Q: Did you just take a chance, Mr. Villalobos, in blasting the boulder, just take a chance?

"A: No, I didn't. I'd known better than that, just to say I'd go in there and take a chance, no. I just plum forgot about it. We were in a hurry to get the place cleaned up.

"Q: What was your attention concentrated on at that moment?

"A: More in the muck, to—we was concentrating—we wanted it cleaned out so we could get paid the whole thing."

Thereafter, Sandoval and Villalobos left the site to guard entrances to the station. The boulder was blasted and five or six minutes later Villalobos heard the mucking machine start, as above described. He went to retrieve more ore cars when four additional explosions occurred.

Concerning the procedure which they had used, Villalobos said the following:

"Q: Has there ever been an occasion when miners, including yourself, have continued mucking after loading?

"A: Yes.

"Q: Were you ever told by anyone in authority not to?

"A: No.

"Q: Now . . . with respect to the igniter cord, was that already tied down when Mr. Rivera made his second visit?

"A: Yes, I'm sure it was."

On cross-examination, Villalobos testified that he had worked with the decedent on previous occasions, but that this was the first time that they had ever blasted boulders under loaded rounds. As to the safety of such an undertaking, Villalobos testified:

"Q: You didn't need any safety meetings to know that that was unsafe? You knew this before this accident ever happened, didn't you?

"A: I'd say yes . . . I should have known better, yes.

"Q: As a matter of fact, you knew before this accident ever happened that was not the right way to do the blasting underneath loaded rounds, didn't you?

"A: Yes."

Later, the following exchange occurred:

"Q: . . . [Y]ou already knew by experience and didn't need any safety instructions about not working under loaded rounds?

"A: Yes, I knew, but I was—I just plain forgot that the shots were up on top and we had our minds on trying to get the thing cleaned up so we would have it all paid up . . . .."

To impeach Villalobos on the question of whether they had been instructed not to work in an area loaded with explosives, appellant introduced his testimony at deposition to the effect that workers had been instructed by their bosses *not* to work in an area after it had been loaded with explosives.

Appellant then offered into evidence the testimony of Robert A. White, the deputy inspector of mines, who participated in an investigation of the accident. He testified that when he arrived at the scene of the accident, he noticed several misfired holes in the roof of the cavity. His basic testimony, read from the accident report which was also in evidence, was as follows:

". . . [T]he direct cause was the four charged holes exploding directly above the deceased which had apparently been set off by plaster blasting the boulder just before. The entire procedure leading to the accident was in direct violation of safe mining practices and the New Mexico Mine Safety Code by the company, mining contractor, and the miners involved . . . .."

He testified that he made several recommendations after the accident, including that regular safety meetings be conducted and that miners be strictly informed of all applicable safety regulations. On cross-examination, White admitted that any experienced miner should know that it was dangerous to work under loaded rounds without the necessity of a safety meeting. White knew the decedent and considered him experienced enough to know of the danger.

The deposition of Joe D. Longacre, another mine inspector, was also introduced by appellant. Longacre agreed that the mine in question was required to comply with safety regulations of the state. On cross-examination, Longacre stated that it should be almost second nature that a miner should not work under loaded overhead rounds. He stated that there is a "human element" in safety procedure which causes

**468**

most of the accidents. When asked about this "human element" by appellant's counsel on redirect, Longacre explained:

". . . I'm sure that the deceased and his partner did not realize, they were in a hurry doing this and that boulder— they had blasted before, they had blasted some big boulders that appeared in the muck pile, that was before they had done this drilling and they just took it for granted and they just completely forgot about those charged holes up there and blasted that boulder."

We have summarized in some detail the evidence put on by the appellant. There was no evidence to contradict the testimony of appellant's own witnesses that the practice of working and blasting underneath loaded explosives was extremely dangerous, and was obvious to any miner. The decedent's working partner testified that he himself should have known better, and that he didn't need any safety meetings to know the procedure was unsafe. The workers were in a hurry to finish the project and "just plain forgot" about the overheard rounds.

The evidence of appellant thus established contributory negligence as a matter of law. This court has held that the trial judge has a duty to direct a verdict when plaintiff's own testimony undisputedly establishes contributory negligence as a matter of law. *Young v. Vincent*, 310 F.2d 709 (10th Cir.). The standards are referred to above. New Mexico courts hold that contributory negligence is a complete bar to recovery, and thus we find no error.

AFFIRMED.