The CATTS COMPANY, an Oklahoma Corporation, Appellant,

v.

GULF INSURANCE COMPANY, a Foreign Insurance Corporation, Appellee.

No. 81–1711.

United States Court of Appeals, Tenth Circuit.

Dec. 30, 1983.

Paul F. McTighe, Jr., Tulsa, Okl., for appellant.

Richard D. Wagner of Knight, Wagner, Stuart, Wilkerson & Lieber, Tulsa, Okl., for appellee.

Before SETH, Chief Judge, and BARRETT and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

The Catts Company (Catts), a Tulsa, Oklahoma, corporation engaged in the business of manufacturing and installing (or providing for installation) fabricated steel, appeals from a judgment upon directed verdict following a jury trial conducted by a

Special Master. The District Court, upon review, upheld the findings and conclusions of the Special Master and entered judgment in favor of Gulf Insurance Company (Gulf). Catts sued on the claim that it had sustained a loss of certain fabricated steel which was, at the time of the loss, insured by Gulf under an Installation Floater Policy. Gulf defended successfully on its denial that the loss was insured under the policy.

On or about November 1, 1971, Gulf, at the request of the Guy Landes Insurance Agency (Landes) which had insured Catts for some years, issued to Catts a Standard Installation Floater Policy for a term from November 1, 1971, through November 1, 1974. It was one of a "package" of policies issued to Catts through the Landes Agency. The general purpose of the Installation Floater Policy was to insure fabricated steel in the Catts yard prior to delivery to a construction site or after delivery but before installation by Catts or a third party. Before referring specifically to the terms of the Floater Policy here involved, we believe that certain facts evidenced by the trial record, disputed or undisputed, should be noted in order to place the legal issue in proper focus.

Normally, Catts received a contract to fabricate and install steel in buildings in accord with plans, specifications and architectural drawings. On occasions, such as in this case, Catts prepared the fabricated steel and delivered it to the job site for installation by a third party, here the Larry Morris Company (Morris Company). Following final delivery in May, 1973, Catts billed Morris Company by invoices. The steel was apparently stolen or otherwise removed from the job site. The steel was never paid for by Morris Company. The property wherein the steel was to be installed was foreclosed upon, a receiver was appointed, and Catts thereafter filed a mechanics lien and materialman's lien against the real property. Henry Perry Catts, Jr., president of Catts, testified that he attempted to locate the steel without success. He wished to recover it for its value to his corporation. Thereafter, Catts made claim upon Gulf under the Floater Policy for the value of the steel delivered at the job site to the Morris Company. Gulf refused to tender payment on the claim.

The Installation Floater Policy with which we are here concerned, provides, in material part:

"1. PROPERTY INSURED:

(a) Materials, fixtures supplies and equipment, being property of the Assured for which they may be liable, intended for installation in connection with the repair, completion, erection or improvement of property (except as hereinafter provided) in the conduct of the Assured's business as

Iron, Steel, aluminum, brass or bronze erection and fabrication.

"2. THIS POLICY ATTACHES:

From the time such property becomes at the risk of the Assured and covers continuously thereafter during transit, while awaiting installation, during installation and until the interest of the Assured ceases, or until expiration of this policy, whichever may first occur.

"3. PROPERTY NOT INSURED:

\* \* \* \* \* \*

(b) Accounts, bills, deeds, currency, money, notes, or securities;

\* \* \* \* \* \*

"4. THIS POLICY INSURES: Except as provided elsewhere in this policy

Against All Risks of Direct Physical Loss of or Damage to the property covered from any external cause.

"5. THIS POLICY DOES NOT INSURE AGAINST:

(a) Loss or damage caused by or resulting from wear or tear, gradual deterioration, mechanical breakdown, nor loss of market or delay or other consequential loss;

\* \* \* \* \* \*

(d) Loss or damage caused by or resulting from infidelity or dishonesty, either or both, by the Assured or by any person or persons in the regular employment or service of the Assured, whether during the regular hours of employment or not:

(e) Any unexplained loss, mysterious disappearance, or loss or shortage disclosed on taking inventory:

"6. VALUATION: This Company shall not be liable beyond the actual cash value of the property insured at the time any loss or damage occurs, plus labor and other charges and/or expenses accrued, but not exceeding the amount which it would cost to repair or replace the same with material of like kind and quality.

"8. DEDUCTIBLE: It is understood and agreed that each claim for loss or damage to property insured hereunder shall be adjusted separately, and from the amount of each adjusted claim the sum of $100.00 shall be deducted.  * * *

"9. REPORTING REQUIREMENTS:

(a) The assured agrees to keep an accurate record of all installations covered hereunder showing the accumulated values of each installation site, including labor, transportation and other accrued charges thereon covered hereunder.

(b) The Assured further agrees to report to this Company on or before the 15th day of each month the total of all such values at risk hereunder including insured values in transit, as of the last day of the preceding month;

(c) The Assured further agrees to pay premium on said reported values at the rate of .08 per $100.00;

(3) In the event of loss or damage to property insured hereunder, this Company shall be liable for no greater proportion of such loss or damage than the total values last reported by the Assured prior to the loss or damage bears to the actual total values at risk hereunder as of the date for which such report was made;"

Henry Perry Catts, Jr., testified that: the steel sold to Morris Company was sold for installation by that company and "It was sold FOB Truck job site" or sold at "Point of delivery." [R., Vol. II, p. 56]; his company had no responsibility and/or liability for the steel delivered to the job site with the exception of its obligation to repair or replace any improperly fabricated material. [R., Vol. II, p. 60]; after delivery of the steel to the job site as requested by the Morris Company, Catts Company had completed its contract [R., Vol. II, p. 62]. On cross-examination, the following questions were answered by Catts relative to the subject policy:

Q. So there won't be any misunderstanding, sir, are you aware of the distinction between a monthly reporting form policy and a standard term or fixed term policy.

A. Yes, I am.

Q. And in business a monthly reporting form policy is a standard or, it is not unusual in a business; is that correct, sir?

A. That is correct.

Q. Under this monthly reporting form policy as I understood it, and I believe there was a stipulation heretofore entered, but the only month that the steel that we are involved with here was ever reported on a monthly reporting form was in May of 1973; is that correct?

A. I cannot state the specific month and time, no, sir.

Q. All right. Well, it would have been at the time that the steel was invoiced; is that correct?

A. That is correct, yes, sir.

Q. And just for the record so we won't have any misunderstanding, can you give me the date that this steel we are concerned with here in this lawsuit was invoiced?

A. We have two invoices: One May the 25th, '73, one June 25th, '73.

[R., Vol. II, pp. 68, 69].

Catts also testified that under Catts' contracts with Morris Company, Catts retained the right to pick up the steel and material at the job site and return it to the Catts plant until it was paid for. [R., Vol. II, p. 76].

Gale Reynolds, head bookkeeper and office manager for the Catts Company, testified that: he had undertaken work with regard to the Floatation Policy issued by Gulf to Catts in that he made up the monthly reports, including forms filled out monthly for the amount of invoices billed that month, which were sent to Gulf; the forms were completed and submitted so

that Gulf "would know what to bill us as far as premium was concerned for a floater policy." [R., Vol. II, p. 119]; the forms showed dates of sale, invoice numbers and total value of the sales; agent Guy Landes had stated that coverage under the reporting forms included material fabricated and delivered at a job site "and until such time that the material was paid for," [R., Vol. II, p. 121], and that Landes notified him to list each invoice separately each month. [R., Vol. II, p. 122]; the invoices covering the May, 1973, sales to the Morris Company were included in Catts' report for that month but not thereafter; they were not included thereafter because Mr. Landes did not instruct him to report the billings-sales more than one time [R., Vol. II, p. 124], and that "he said that the material would be insured from the time it left our shop until it reached the job site and was installed and we were paid for it." [R., Vol. II, p. 126]; with regard to premium payments, Catts was obligated to pay premiums of 7 cents per $100.00 worth of materials invoiced each month [R., Vol. II, p. 131], but the premium for a particular monthly invoice continued coverage "until the material was paid for." [R., Vol. II, p. 132]. Reynolds attributed this view to the statement he claimed Landes made that the material sold need only be reported the month it was sold. [R., Vol. II, p. 132]. Thus, according to Reynolds' understanding, Gulf's liability under the policy continued until the materials reported had been paid, regardless of the time period involved:

> THE COURT: On the other hand, if you delivered material and invoice for $1,000.00 to the Morris Company, and that material was not paid for for fifteen months, your premium would still be seventy cents for the risk carried by the insurance company for the entire period of time?

> MR. REYNOLDS: We were told to report the invoice one time and there was nothing ever said about reporting that invoice each month until it was paid for.

> THE COURT: Then it was your understanding that paying that premium of seventy cents entitled you to coverage for—

> MR. REYNOLDS: Until the material was erected and paid for.

> THE COURT: If it required a period of fifteen months for payment to be made?

> MR. REYNOLDS: Absolutely.

[R., Vol. II, pp. 132, 133].

Guy M. Landes, Jr., testified that: his agency had written insurance for Mr. Catts and the Catts Company since 1950; the Installation Floater policy written for Catts on Gulf was received by Landes and Catts following receipt of the form, including the reporting requirements. [R., Vol. II, pp. 149–156]. On cross-examination, Landes stated that: he spoke with Mr. Catts about the policy on a couple of occasions by phone; he discussed the matter jointly with Mr. Catts and Mr. Reynolds when he delivered the policy [R., Vol. II, p. 158]; he then handed them a pad of monthly reporting forms and instructed them that the fabricated steel should be reported as to value monthly as long as the steel *belonged* to Catts; he was sure that he advised Mr. Catts that he should report all fabricated steel *he owned* each month for as long as he retained it because the rate was a monthly rate and that was the basis for computing the premium due Gulf; he had no recollection of having advised Reynolds that once fabricated steel was reported on a monthly report that it was covered and need not be reported again or that once reported it was covered until paid for; instead, he recalled advising Reynolds that he should report the value of all fabricated steel owned by Catts Company at the end of each month because that was the only way that the value of the fabricated steel could be fixed and the premium due each month determined. [R., Vol. II, pp. 159–161].

At the close of all of the evidence, Gulf renewed its motion for a directed verdict. The Special Master granted the motion and directed the jury to return a verdict for Gulf. In material part, the Special Master, a former United States District Judge with years of experience, found/concluded, *inter alia:*

[A]s a matter of law that this installation floater covered property described only for the months that it was reported by the insured ... it was a type policy that was intended to cover the fabricated material wherever it might be located as long as it was owned by the plaintiff, by the insured, and they paid a very low premium rate, seven cents per hundred of value per month. And under the policy the material to be insured had to be reported and described and the premium paid on it for that month.

[T]he steel was delivered by [Catts] to the purchaser Morris and Company at the job site, and at that time Morris and Company acquired title to the steel. If the plaintiff [Catts] thought he retained any interest in that steel he certainly didn't report it as being property owned by him to be reported monthly.

*Plaintiff [Catts] relies upon the theory that the agent told him that he might just report it for the particular month that he invoiced it and it was not necessary to report it thereafter. It seems to me that's contrary to the terms of the policy and that the coverage of the policy cannot be enlarged or increased by virtue of that alleged representation on the part of the agent.*

The title passed to this steel at the time of delivery. There was a contract entered into with the purchaser that if the steel was not paid for the seller could repossess it, pick it up. There was never any attempt on the part of the plaintiff to repossess.

\* \* \* \* \* \*

So I conclude as a matter of law that this was not a loss that was covered by the policy and that the plaintiffs are not entitled to recover. [Emphasis supplied]. (R., Vol. II, pp. 166–168].

Pursuant to Fed.R.Civ.P. 53(e)(4), the District Court thereafter entered Judgment and Order adopting and approving the questions of law ruled upon by the Special Master for the reasons stated by the Special Master. This appeal followed.

On appeal, Catts contends that the trial court erred in granting judgment for Gulf in that (1) the subject insurance policy did cover Catts' loss; (2) a factual issue remains to be determined by the jury, to-wit: The question of estoppel and/or waiver caused by Gulf's agent Landes; (3) the trial court erred in approving the findings of the Special Master who directed a verdict for Gulf.

I.

We believe that the first issue presented for our review is dispositive. Catts contends, contrary to the conclusion of the Special Master and the District Court, that the Floater policy issued to it by Gulf did cover the loss claimed herein. We hold that the District Court did not err and that, as a matter of law, the loss sustained by Catts was not insured under the policy terms and provisions.

The basic problem presented by Catts is that it is equating an insurable interest it retained in the fabricated steel sold and delivered to Morris Company at the job site with its insurance "coverage" under the policy issued by Gulf. We recognize that Catts had an "insurable interest" in the steel invoiced, sold and delivered to Morris Company. This arose by virtue of the reservation made by Catts in its contracts with Morris Company of the right to "pick-up from the site materials previously delivered and not paid for." [R., Vol. I, pp. 52–54]. Under the law of Oklahoma, such a reservation does constitute a security interest. Okla.Stat.Ann. tit. 12A, § 2–401(1) (West 1963); *O'Dell v. Kunkel's, Inc.*, 581 P.2d 878 (Okl.1978). Furthermore, a seller's security interest is an insurable interest under Oklahoma law. *See* Okla.Stat.Ann. tit. 12A, § 2–501(2) (West 1963). Having concluded, as we do, that Catts retained a "security interest" in the steel, the question then is: Is the retained "security interest" such as to be the agreed upon property interest Gulf extended insurance coverage to Catts for under the Installation Floater Policy? We hold that it is not.

"Coverage" is necessarily determined by the policy provisions. We agree that, as a matter of law, the policy terms and provisions do not extend insurance cov-

erage to the interest retained in the steel by Catts following delivery.

In the Pre-trial Order approved by the parties and entered by the Court, it was agreed without requirement of proof, *inter alia:*

C.  Coverage on certain risks were secured by the insured reporting all values at risk each month by a monthly reporting form.  That such monthly reports were filed each month to April 1974, and the only instance of reporting the steel involved herein was on form for May, 1973.

[R., Vol. I, p. 41].

The above stipulation can, as the Special Master observed, relate only to the coverage contemplated by the policy under the monthly reporting forms and requirements set forth in detail heretofore under 9.  REPORTING REQUIREMENTS, (a), (b), (c) and (3), *supra.*  The sole basis for computation of the premium to be paid monthly was predicated on the "property of the assured" reported and valued on the monthly forms.  Thus, for "coverage" purposes, it was required that Catts, as the insured, list and report monthly "the total of all values at risk hereunder as of the last day of the preceding month."  For "coverage" purposes, Catts was required to establish a loss to its *insured* property; i.e., "property of the assured" against loss by virtue of the payment of monthly premium therefor for the reporting period involved.

It is axiomatic that an insurance transaction is contractual in nature involving the traditional offer and acceptance theory.  *See,* 12 Appleman, Insurance Law, §§ 7121, 7151 (1943); 1 Couch, Insurance Law, § 7.8 (2d ed. 1959).  The quid-pro-quo in every instance requires the payment of a premium by the insured in return for the "risk" coverage promised by the insurer.  In *Fenwick Machinery, Inc. v. A. Tomae & Sons, Inc.,* 79 N.J. 590, 401 A.2d 1087 (1979), the court observed that under a "floater policy" coverage is generally limited to owned property in the possession or control of the insured and does not include property owned by the insured but leased to another.

The record supports Gulf's position that Catts had no interest in the steel *under the terms of the policy contract,* regardless of the fact that Catts retained a "security interest."  Furthermore, the contract required that Catts, as a condition precedent to Gulf's liability, list the subject steel on monthly reports Catts agreed to submit to Gulf.  Catts *did not* list the steel on monthly reports following the report submitted to Gulf for the month of May, 1973, notwithstanding that Catts had sold, delivered and invoiced the subject steel to Morris Company during or prior to that period.  Under these circumstances, the failure by Catts to abide the contract provisions for coverage renders its invocation of the insurable interest doctrine meaningless.

■  No representative or agent of Gulf led Catts to believe that submission of the monthly reports was not a prerequisite to coverage liability.  Accordingly, the doctrine of estoppel cannot apply.  Catts admits that it did not properly report the subject steel following its May, 1973, monthly report.  Even so, Catts relies on its claim that Mr. Landes' (whom Catts refers to as Gulf's agent, notwithstanding Landes' testimony otherwise) statement that once a particular amount of steel was reported to Gulf for a particular month that the steel would continue to be covered under the policy as long as Catts retained an interest in it.  Even if Catts were arguably justified in relying upon the asserted representation made by Landes, the record reflects that Catts well understood that this "inventory" floatation policy involved *monthly premium* payments to Gulf predicated on monthly "inventory" of steel to be reported as "property of the assured."  To permit Catts recovery against Gulf under the circumstances evidenced here would be to grant Catts an unconscionable advantage, measured in terms of a monthly premium payable at the rate of only seven cents per one hundred dollars of "inventory" reported only for the month of May, 1973.

■  It is fundamental that contracts of insurance will be liberally construed in favor of the objects to be accomplished, and

if provisions of a policy are capable of being construed in two ways, that interpretation should be placed on such provisions which is most favorable to the insured. *Aetna Ins. Co. v. Zoblotsky*, 481 P.2d 761 (Okl.1971). An insurance policy should be construed, as every other contract, according to its terms when it is not ambiguous. *Carraco Oil Co. v. Mid-Continent Cas. Co.*, 484 P.2d 519 (Okl.1971). A contract should be read in its entirety and construed from its "four corners," so as to give effect to each clause.

In *Dossey v. United States Fidelity and Guaranty Co.*, 528 P.2d 417 (Colo.App.1974), the Court interpreted language in fire policies covering stock, materials and supplies that were "the property of the insured" to mean ownership or dominion over by virtue of a binding contract for sale.

In *Highlands Ins. Co. v. Fischer*, 122 Ariz. 394, 595 P.2d 186 (1979), the court held that the phrase "property of others" used in a statute requiring a motor vehicle liability policy to provide specific coverage because of injury to or destruction of property of others refers to property owned by someone other than the named insured.

In *State v. Poyntz*, 168 Or. 69, 120 P.2d 966 (1942), the court held that under an indictment for larceny containing language charging that the property stolen was the "property of" a corporation that such language implied ownership.

We hold that the language in the policy here at issue extending coverage to "property of the assured" does, when read in context, extend coverage only to the steel owned by Catts.

## II.

■ Catts argues that a factual issue remains to be determined by the jury, to-wit, the question of estoppel and waiver caused by the alleged actions and representations made by Gulf's agent Landes to Catts that once property was reported on any monthly reporting form by Catts to Gulf that it remained covered under the policy for the term thereof.

In *Serman v. Unigard Mutual Insurance Company*, 504 F.2d 33 (10th Cir.1974), we held that an insurance agent cannot confer authority upon himself, citing to 2 A, C.J.S., Agency, § 143, p. 763 (1972). A general rule of insurance law is that "[T]he doctrine of waiver ... does not pertain to matters of coverage so as to extend the scope of the contract beyond its express terms through the acts of an agent not authorized or approved by the company." *Peters v. Great Am. Ins. Co.*, 177 F.2d 773, 778 (4th Cir. 1949), 1 A.L.R.3rd 1139, § 3 and cases cited therein (Supp., August 1983). There are cases supporting a contrary view, although they constitute a minority. *See*, 1 A.L. R.3rd 1139, § 4 and cases cited therein (Supp., August 1983). The issue has not been resolved by the Oklahoma courts. In *Security Insurance Co. of New Haven v. Greer*, 437 P.2d 243, 246 (Okl.1968), the court observed that it "[h]as not had occasion expressly to adopt or reject any limitations on the availability of waiver and estoppel in actions against insurers."

Waiver is the voluntary, intentional relinquishment of a known right. No such relinquishment by Gulf is evidenced in the case at bar. Estoppel refers to an abatement raised, as a matter of law, of rights of the insurer under circumstances where it would be inequitable to permit their assertion. There are no facts in this record justifying the invocation of this doctrine. *See*, Appleman, Insurance Law and Practice, § 9081 (1981). The doctrine of implied waiver and of estoppel, predicated upon the acts of the insurer, does not bring within the coverage of a policy risks not covered by its terms. 43 Am.Jur.2d, Insurance, § 465.

## III.

■ Finally, Catts contends that the trial court erred in approving the findings of the Special Master who directed a verdict for Gulf. We disagree.

Fed.R.Civ.P. 50, specifically authorizes the court to grant a motion for directed verdict at the close of the evidence without any assent of the jury. A verdict may be directed if the evidence supports one position only and supports no reasonable inferences which sustain the position of the party against whom the verdict is directed.

*Stiner v. United States,* 524 F.2d 640 (10th Cir.1975). A motion for summary judgment is similar to a motion for a directed verdict in the sense that both motions function in the interest of saving money, time and effort when there is no genuine issue of material fact. *Gleason v. Title Guarantee Co.,* 317 F.2d 56 (5th Cir.1963).

Catts is critical of the Special Master in that he declined to grant Gulf's Motion for Summary Judgment before entertaining evidence, but after three days of trial granted the motion for directed verdict. Catts states "[i]t is difficult to ascertain how the special master could have reached a different interpretation of the law after three days." [Brief of appellant, p. 20]. Catts does not refer to our holding in *Sandoval v. U.S. Smelting, Refining & Mining Co.,* 544 F.2d 463 (10th Cir.1976) that the denial of a motion for summary judgment *does not* rule out the possibility of the grant of a motion for a directed verdict pursuant to Rule 50. In *Sandoval* we observed:

> Appellant here contends the trial court erred by granting a directed verdict when it had earlier denied appellee's motion for summary judgment. She argues that since evidence garnered at the discovery stage was virtually identical to that introduced at trial, the court's directed verdict, when summary judgment was previously denied, was improper. However, a denial of summary judgment does not rule out the possibility of a directed verdict, *Gross v. Southern Railway Co.,* 446 F.2d 1057 (5th Cir. [1971]); 5 Moore, Federal Practice (2nd Ed.) Section 50.-03(4), p. 2338.

544 F.2d at pp. 464, 465.

We see no merit in Catts' assertions that the Special Master abused his discretion in directing a verdict or the innuendo that he had predetermined the outcome of the action. [Brief of Appellant, p. 21].

Here, of course, the District Court adopted the findings and conclusions of the Special Master, following a complete review. This is a diversity of citizenship case. The federal district court sits as a state trial court in diversity cases and applies the law of the forum state. *Miller v. City of Bro-*

*ken Arrow, Okl.,* 660 F.2d 450 (10th Cir. 1981); *Hackbart v. Cincinnati Bengals, Inc.,* 601 F.2d 516 (10th Cir.1979), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 188 (1979).

In diversity based cases the party seeking reversal must establish that the alleged trial court errors were prejudicial and clearly erroneous, rather than harmless. Fed.R. Civ.P. 52(a), "Where an issue is not clear of doubt, the views of a federal district judge [in a diversity case] who is a resident of the state where the controversy arose interpretive of that state's laws, carry extraordinary force on appeal where there are no state decisions directly on point or none which provide a clear precedent." *Rasmussen Drilling v. Kerr-McGee Nuclear Corp.,* 571 F.2d 1144, 1148 (10th Cir.1978). *See also: Douglass v. Hartford Ins. Co.,* 602 F.2d 934 (10th Cir.1979); *Glenn Justice Mortgage Co. v. First National Bank of Fort Collins,* 592 F.2d 567 (10th Cir.1979); *United States v. Hunt,* 513 F.2d 129 (10th Cir.1975).

WE AFFIRM.

McKAY, Circuit Judge, dissenting:

This is a case in which the trial court granted a directed verdict. If there were any issues of fact, that verdict cannot stand. The issues are only two: (1) whether the policy of insurance covers the kind of interest the plaintiff had in the steel at issue; and (2)·whether there was evidence from which the jury could have concluded that the company waived the requirement for monthly listing of inventories. Since I read the law and facts as requiring affirmative answers to both questions, I must respectfully dissent.

*Coverage*—The district court held that the policy did not cover the steel at issue since Catts had sold it and had no title to it when it disappeared. The policy provides as follows: "THIS POLICY ATTACHES: From the time such property becomes at the risk of the Assured and covers continuously thereafter during transit, while awaiting installation, during installation and *until the interest of the Assured ceases* ...." Record, vol. 1, at 94 (emphasis add-

ed). Gulf and the trial court have both assumed that Catts' interest in the steel ceased when Catts sold it and title passed to the buyer. Apparently the majority concedes that this conclusion was erroneous. *Ante* at 1499–1500. Catts claims, and Gulf does not deny, that Catts had a security interest in the steel at the time it disappeared.[1] Under Oklahoma law, a seller's security interest is an insurable property interest. *See* Okl.Stat.Ann. tit. 12A, § 2–501 (West 1963). Since there is no reason to read "interest" in this insurance policy as meaning "title" rather than insurable interest, this policy, by its own terms, extended coverage to Catts' retained security interest in the steel.[2]

*Reporting*—Catts admits that it did not properly report the steel in its monthly reports. However, it argues that the trial court erred in holding that Gulf, as a matter of law, could not have waived or be estopped to assert the reporting requirement. The policy required Catts to report each month the total amount of steel to be insured that month. Catts claims that Gulf's agent told Catts that once a particular load of steel was reported for a single month, the reported steel would be covered so long as Catts retained an interest in it. Thus, the argument goes, Gulf is precluded by the doctrines of waiver and estoppel from relying on Catts' underreporting its inventory.

The courts are split on whether an insurance company can waive or be estopped to assert a policy's monthly reporting requirements. *Compare Mountain View Sports Center, Inc. v. Commercial Union Assurance Co.,* 599 P.2d 1382 (Alaska 1979), *with Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.,* 287 F.2d 316 (7th Cir.), *cert. denied,* 368 U.S. 826, 82 S.Ct. 45, 7 L.Ed.2d 29 (1961). The rationale of the cases holding waiver and estoppel legally precluded is that such a waiver would expand a policy's coverage. In those jurisdictions, while an insurance company can waive a policy's requirements that would otherwise result in forfeiture of coverage already contemplated by the policy, it cannot, through waiver or estoppel, expand the policy's coverage. *See, e.g., Northern Assurance Co. of America v. Stan-Ann Oil Co.,* 603 S.W.2d 218, 223 (Tex.Civ.App.1979). The Oklahoma courts have not adopted or rejected this limitation on waiver by or estoppel of insurance companies. *See Security Ins. Co. v. Greer,* 437 P.2d 243, 246 (Okl.1968). This court, although not explicitly addressing the forfeiture-coverage distinction, has construed Oklahoma law as allowing insurance companies to waive monthly reporting provisions in insurance policies. *See American Eagle Fire Ins. Co. v. Burdine,* 200 F.2d 26 (10th Cir.1952).[3] Since there is no indication that Oklahoma law on this issue has changed since *American Eagle* was decided, there is no reason to question this court's earlier judgment. An appeal to the notion in some of our cases that the local trial judges' views lends a special sanctity to his inter-

---

1. Catts, in its contracts with the purchaser of the steel, reserved the right to "pick-up from the site materials previously delivered and not paid for." Record, vol. 1, at 52–54. Under Oklahoma law, such reservations constitute a security interest. Okla.Stat.Ann. tit. 12A, § 2–401(1) (West 1963); *see O'Dell v. Kunkel's, Inc.,* 581 P.2d 878 (Okl.1978).

2. Gulf also argues that even if Catts had an insurable interest in the steel as required by the policy, the steel nevertheless was not covered since the policy expressly excluded coverage of "[a]ccounts, bills, deeds, currency, money, notes or securities." Although difficult to divine, Gulf's argument, apparently, is that after Catts sold the steel, it retained only an unpaid debt, which was no more than an account or a note. This argument ignores the fact that Catts' security interest was a distinct property

interest in the steel itself; Catts' claim is not that the policy covered the buyer's debt, but that it covered the security interest that Catts lost when the steel disappeared.

3. The policy in *American Eagle* provided that if the insured failed to file his monthly reports, the last filed report would govern. In the instant case, the policy does not state the consequences of a failure to file a report. However, this difference does not affect the impact of *American Eagle* on the instant case. At most, the absence of a clause specifying the consequences for a failure to report renders it more clearly an act resulting in forfeiture of the policy, which can uniformly be waived, rather than an alteration of its coverage, which is subject to waiver or estoppel in only some jurisdictions. *See Hanover Ins. Co. v. McLoney,* 205 F.Supp. 49 (E.D.Ky.1962).

pretations of local law, even ignoring that its rationalization was never sound and is now more than ever untenable, is inappropriate in this case where its application flies in the face of our own prior mark on this issue. It would make this court's determination of legal issues in diversity cases little more than a will-o'-the-wisp. Accordingly, I conclude that the trial court erred in holding that an insurance company cannot waive or be estopped to assert a monthly reporting provision in an insurance policy.

Under Oklahoma law, the existence of waiver or estoppel is a question of fact. *See L.C. Jones Trucking Co. v. Cargill,* 282 P.2d 753 (Okl.1955) (estoppel); *Continental Ins. Co. of New York v. Hall,* 192 Okl. 570, 137 P.2d 908 (1943) (waiver). In the instant case, Mr. Catts' testimony, when viewed most favorably to Catts, could support a finding of waiver or estoppel or both. I would remand for trial to the jury on the waiver issue.